[No. B077314. Second Dist., Div. Four. June 3, 1996.]

EDWARD M. SIEGEL et al., Plaintiffs and Appellants, v.
FIDELITY NATIONAL TITLE INSURANCE COMPANY, Defendant and
Appellant.

**COUNSEL**

Edwin D. Hausmann, Esner, Zakheim & Higa, Esner, Higa & Chang, Esner & Higa, Stuart B. Esner, Rosalyn S. Zakheim and Billie Ann U. Higa for Plaintiffs and Appellants.

Richard D. Simpson, Jr., Stephen E. Anderson, Ervin, Cohen & Jessup and Allan B. Cooper for Defendant and Appellant.

## OPINION

**BARON, J.**—Appellant Fidelity National Title Insurance Company appeals from a judgment in favor of Edward M. and Howard B. Siegel. Liability was based on Fidelity's failure to disclose a lien recorded against property purchased by the Siegels. The issue we are called on to resolve was settled by 1981 amendments to the Insurance Code and cases interpreting those amendments. It is apparent, however, that despite clear authority to the contrary, parties to real estate transactions continue to misunderstand the purpose of preliminary title reports and title insurance policies and mistakenly rely on the accuracy of the information contained in those documents. As we explain, a party who fails to obtain title insurance and instead relies on a preliminary report or title insurance policy showing no encumbrances does so at his own peril and cannot thereafter maintain an action against the insurer when an undisclosed lien comes to light.

### BACKGROUND

*The Real Estate Transaction*

Edward and Howard Siegel are brothers. Along with defendant and cross-respondent George Liebman, their half brother, the Siegels were the beneficiaries of a trust set up by their mother to hold title to a duplex. After Mrs. Liebman's death, Liebman offered to sell his one-third interest in the property to the Siegels. The brothers agreed on a price of $150,000 with the Siegels to pay all closing costs. The Siegels consulted with Attorney Irwin Groner to prepare the necessary documents, and hired mortgage loan broker Marina Mortgage to procure a loan. The broker engaged Diamond Country Escrow (DCE) to handle the escrow. Fidelity was selected to provide title insurance.

The deal was set up as a "refinance escrow."[1] Because of this categorization, DCE instructed Fidelity to provide only an ALTA lender's policy and

---

[1]As will be seen, a central dispute in this case is whether the Siegels were fully informed of the consequences of proceeding as if it were a refinance rather than a sale.

not an owner's policy.[2] DCE also requested that Fidelity act as "sub-escrow" by holding the funds and recording the deeds on its behalf.

The transaction was arranged so that the trust deeded the property to the three brothers and Liebman immediately quitclaimed his interest to the Siegels in exchange for $150,000. During the few moments when an interest in the property was held by Liebman, a judgment lien in the amount of $100,127 recorded in 1980 by Steven Jacoby attached. Jacoby had obtained a judgment against Liebman several years earlier.

Fidelity had prepared a preliminary title report in connection with issuing the title insurance policy for the lender, but it contained no reference to this lien. The parties did not learn of it until several months later, when Jacoby appeared to press his claim. Ultimately, the Siegels were forced to acknowledge Jacoby's interest in the property and were unable to obtain reimbursement from Liebman.[3]

## The Complaint Against Fidelity

The Siegels brought claims against Liebman, Groner, DCE, Jacoby, and Fidelity. Groner and DCE settled, Liebman prevailed at trial, and Jacoby was granted a nonsuit. This appeal deals with the dispute between the Siegels and Fidelity.

The essence of the Siegels' complaint against Fidelity was contained in the following allegation: "Fidelity provided a preliminary title report that

---

[2]As explained by Miller and Starr's treatise: "The form and contents of title insurance policies used by most title insurers in this state have been standardized through endeavors of the California Land Title Association (CLTA) and the American Land Title Association (ALTA). Member companies generally use the forms of title policies designed by these associations. . . . [¶] Both the California Land Title Association and the American Land Title Association have prepared forms for both an owner's policy and a lender's policy. The CLTA form of owner's policy may be used to insure both a lender and an owner; the ALTA policies are limited to the separate forms for insuring either a lender or an owner, but neither form can be used to insure both." (3 Miller & Starr, Cal. Real Estate (2d ed. 1989) Title Insurance, § 7.12, p. 33.) Elsewhere the treatise discusses the differences in coverage between the two: "Basically, the CLTA Standard Coverage Policy only insures the title as shown by the public records. Most off-record matters are excluded since the insured ordinarily can inspect the premises and discover these defects himself. . . . [¶] The ALTA Loan Policy is an extra coverage, extra premium policy designed to insure against losses from many risks excluded by the Standard Coverage Policy. The insurer undertakes these extra risks by assuming the insured's responsibility to inspect the property and, in some cases, to review a survey. . . . [¶] The ALTA Loan Policy is designed to insure the lien of a lender. . . ." (*Id.*, §§ 7:55, 7:56, p. 96.)

[3]At trial, the jury rejected the Siegels' claims against Liebman. The Siegels' appeal from the judgment rendered in favor of Liebman was stayed by Liebman's bankruptcy. Earlier this year, the Siegels dismissed the appeal.

failed to disclose the abstract and failed to issue a title insurance policy as per the agreement between the parties." Based on this contention, the Siegels brought claims against Fidelity for both breach of contract and negligence. The negligence cause of action asserted that Fidelity was liable for "failing to discover or discovering and failing to disclose the abstract of judgment against George M. Liebman and by failing to issue to the plaintiffs a title insurance policy, although premium was paid to them." In the contract cause of action, the Siegels alleged on information and belief that Fidelity agreed to issue title insurance on the property to them. An alternate contract claim was brought for breach of the escrow agreement, stating that "Fidelity was required to provide to the plaintiffs a preliminary title report and title insurance on the subject property with the plaintiffs being named as the insured . . . ." The breach of escrow agreement cause of action went on to state that "Fidelity breached the escrow agreement by failing to provide an accurate preliminary title report, by failing to issue a policy and by refusing to pay a loss, which would have constituted a covered loss."

In a separate cause of action, the Siegels also charged that Fidelity was estopped to deny the existence of a title insurance contract based on the Seigels' payment of a premium to Fidelity in an amount equal to the premium for a "joint protection policy," Fidelity's acceptance of the payment, and its representation that such a policy had been issued. Finally, the Siegels sought damages for breach of the covenant of good faith and fair dealing based on Fidelity's failure to defend against the encumbrance, denial of the existence of a policy, and failure to disclose the existence of the judgment lien in the first instance.

Fidelity moved for summary judgment on the ground that it was not retained or paid a premium to insure the Siegels and that under California law a title insurer has no duty to accurately report on defects in title in a preliminary title report. The motion was initially granted, but the judge who heard the motion discovered a conflict and recused himself, reversing his original order. The case was assigned for trial. After opening statements, Fidelity moved for nonsuit. The court denied the motion without prejudice.

*The Evidence at Trial*

Dispute at trial revolved around the questions of why only an ALTA lender's policy was issued and whether Fidelity had ever been instructed to issue an owner's policy. Jennifer Phillips, who prepared the escrow instructions on behalf of DCE, testified that she specifically told Edward Siegel that if the deal were set up as a refinance transaction, there would be title

insurance for the lender but not the buyers, and that he agreed to go forward on that basis. Edward and Howard Siegel testified that they told Phillips and Marina Mortgage that they wanted title insurance, that Phillips told Edward there would be title insurance, and that they were never told about the difference between a refinance escrow and an ordinary escrow.

There was no dispute that Fidelity was not a party to any of the conversations concerning the type of escrow to set up or which insurance to obtain, and had no direct contact with the Siegels prior to the close of escrow. Both Phillips and Jill Culver, Fidelity's title officer, testified that DCE's instructions to Fidelity called for issuance of an ALTA lender's policy only.

The initial set of escrow instructions stated that the transfer of funds was to take place "provided that on or before March 29, 1989, you hold a policy of title insurance with the usual title company's exceptions with a liability of $150,000.00 . . . ." It did not say what kind of title insurance. The final set of escrow instructions and the lender's instructions referred to the required policy as an "ALTA policy," but did not define the term.

The evidence revealed that Fidelity's search department obtained a print-out of the Jacoby lien the Friday before the closing,[4] but that it did not come to the attention of Jill Culver. The usual course taken by a title insurer after finding a lien or other cloud on title is to exclude it from coverage and notify the escrow company. If Fidelity had notified DCE or excluded the Jacoby lien from coverage, all parties agree the transaction would not have gone forward until it had been removed.

*The Trial Court's Rulings and the Special Verdict*

After the close of evidence, Fidelity renewed its motion for nonsuit. Although the court denied the motion, it was not persuaded by any of the legal or factual theories advanced by the Siegels. Instead, the court concluded that the evidence established that Fidelity owed a contractual duty to

---

[4]Again turning to Miller and Starr's treatise for further elucidation: "Usually the title company does not perform its search in reliance on the grantor-grantee index in the recorder's office. To facilitate the search, an insurer or underwritten title company usually creates and maintains its own current records, collectively called the 'plant.' Most information published in a title insurance policy or other report is gathered from records maintained in the searcher's own plant. The insurer or underwritten title company engages qualified, experienced personnel to review, report, post, and index all documents deposited in the public records that impart constructive notice to purchasers of encumbrances. The information received is transferred into its own records." (3 Miller & Starr, Cal. Real Estate, *supra*, Title Insurance, § 7.5, p. 16, fns. omitted.) In this case, Jill Culver testified that Fidelity's information came from TRW computer records.

*the escrow company*, DCE, to notify it of problems with the title and that the Siegels were the third party beneficiaries of that duty. The Siegels were allowed to amend their complaint to allege that Fidelity entered into an oral contract with DCE, an agent of the Siegels, to provide title insurance to the lender and to act as sub-escrow in distributing funds and recording the deeds of reconveyance.[5] Under this contract, the amended complaint alleged, Fidelity had a duty to disclose judgment liens to the escrow agency, and the Siegels, as intended third party beneficiaries, were entitled to the benefit of that duty. In allowing this amendment, the court ruled that the only damages recoverable were contractual and limited to the $150,000 paid to Liebman. Other types of damages claimed, such as emotional distress damages, punitive damages, and damages associated with attorney fees expended contesting the lien, were not allowed against Fidelity.

In a special verdict form prepared by the court, the jury found that Fidelity "violate[d] its agreement with [DCE] as agent, and the Plaintiffs Siegel as principals, in failing to report information in derogation of title it discovered on May 5, 1989[.]" The Siegels were awarded $150,000, plus prejudgment interest of $61,250. Although the Siegels had settled with Groner and DCE for $120,000, the court did not reduce the judgment by that amount, ruling that because the settlements were of different claims, no reduction was warranted. Fidelity appealed from the judgment. The Siegels cross-appealed contending the court erred in limiting their theories of recovery and damages.

On appeal, Fidelity argues that the duty recognized by the court was precluded by statute, and that in any event the court erred in allowing the Siegels to amend their complaint to state a new theory of liability so late in the proceedings. Fidelity also seeks reduction in the damages awarded in the amount of the pretrial settlements with Groner and DCE. The Siegels seek remand and retrial on the issues of negligence and damages. We agree with Fidelity that there is no basis for liability on the facts presented, and therefore do not reach the damage issues raised by the parties.

DISCUSSION

I

The Siegels sought to establish that Fidelity negligently failed to locate and disclose the existence of impediments to title. ▮ But a title insurer

---

[5]Plaintiffs also sought to allege that Fidelity was liable for negligent misrepresentation for failing to disclose the existence of the judgment lien. The proposed amendment to state a claim for negligent misrepresentation was not permitted by the court.

who has not undertaken to perform as an abstractor owes no duty to disclose recorded liens or other clouds on title. The reason derives from the difference between an abstract of title prepared by an abstractor and a preliminary title report prepared by a title insurer prior to issuing a title insurance policy. As stated in the Insurance Code, an "abstract of title" is "a written representation, provided pursuant to a contract, whether written or oral, *intended to be relied upon by the person who has contracted for the receipt of such representation*, listing all recorded conveyances, instruments or documents which, under the laws of this state, impart constructive notice with respect to the chain of title to the real property described therein." (Ins. Code, § 12340.10, italics added.) "Preliminary reports," on the other hand, are "reports furnished in connection with an application for title insurance and are offers to issue a title policy subject to the stated exceptions set forth in the reports and such other matters as may be incorporated by reference therein." (Ins. Code, § 12340.11.) Section 12340.11 specifically states that preliminary reports "are not abstracts of title, nor are any of the rights, duties or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report. *Any such report shall not be construed as, nor constitute, a representation as to the condition of title to real property,* but shall constitute a statement of the terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted." (Ins. Code, § 12340.11, italics added.)

Prior to the enactment of these statutes, the majority of courts equated the duties of an abstractor of title with the duties of a title insurer, as the case of *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470] illustrates. There the title company had issued a preliminary title report and policy indicating no significant clouds on title. After closing the sale, the buyers discovered a recorded easement which interfered with their plans to develop the property, and sued the insurer for negligence. Looking at the question of whether the title insurer owed a duty of care to the buyers, the court concluded: "When a title insurer presents a buyer with both a preliminary title report and a policy of title insurance, two distinct responsibilities are assumed. In rendering the first service, the insurer serves as an abstractor of title . . . ." (48 Cal.App.3d at p. 938.) Because it was well established that an "abstractor of title" must " 'report all matters which could affect his client's interests and which are readily discoverable from those public records ordinarily examined when a reasonably diligent title search is made' " (*id.* at p. 939, quoting *Contini* v. *Western Title Ins. Co.* (1974) 40 Cal.App.3d 536, 545-546 [115 Cal.Rptr. 257]), the court held that the insurer "must list *all* matters of public record regarding the subject property in its preliminary report. [Citations.]" (*Jarchow* v. *Transamerica*

*Title Ins. Co., supra,* at p. 938; accord, *White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 883 [221 Cal.Rptr. 509, 710 P.2d 309]; *Wilkinson* v. *Rives* (1981) 116 Cal.App.3d 641, 650 [172 Cal.Rptr. 254]; *Banville* v. *Schmidt* (1974) 37 Cal.App.3d 92, 100-106 [112 Cal.Rptr. 126]; *Northwestern Title Security Co.* v. *Flack* (1970) 6 Cal.App.3d 134, 145 [85 Cal.Rptr. 693].)

But equating the duties of an abstractor with those of a title insurer makes little sense in light of the function of title insurance. ". . . The title insurance policy was developed in California as a substitute for the use of abstracts of title. While an abstract is a summary of the record without exceptions, and is a representation that the title is in the condition described, which often contains an opinion regarding the condition of title, a policy of title insurance is not a representation that the title is in the condition described, and it is not an opinion regarding the condition of title. The policy expressly provides merely that the insurer will pay any loss or damage suffered by the insured from any omitted defect not excluded by the terms of the policy." (3 Miller & Starr, Cal. Real Estate, *supra*, Title Insurance, § 7:141, pp. 251-252, fns. omitted. See also *Fidelity National Title Ins. Co.* v. *Miller* (1989) 215 Cal.App.3d 1163, 1175 [264 Cal.Rptr. 17] [" 'Title insurance is a contract for indemnity under which the insurer is obligated to indemnify the insured against losses sustained in the event that a specific contingency, e.g., the discovery of a lien or encumbrance affecting title, occurs. [Citations.] The policy of title insurance, however, does not constitute a representation that the contingency insured against will not occur. [Citations.] Accordingly, when such contingency occurs, no action for negligence or negligent misrepresentation will lie against the insurer based upon the policy of title insurance alone. [Citations.]' (*Lawrence* v. *Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70, 74-75 [237 Cal.Rptr. 264].) A title policy is '. . . a contract to indemnify against loss caused by defects in the title or encumbrances on the title. It is not a representation that the title is in any particular condition. [Citation.]' (*Smith* v. *Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 631 [223 Cal.Rptr. 339].)"

Put another way, the function of title insurance is to protect against the possibility that liens and other items not found in the search or disclosed in the preliminary report exist. The records pertaining to real property are complex and encumbrances may be missed by even the most thorough search. Title insurance is an acknowledgment that errors may have been made. In enacting Insurance Code sections 12340.10 and 12340.11, the Legislature recognized that no reliance should ever be placed on a preliminary report or a policy of title insurance to show the condition of title. (*Fidelity National Title Ins. Co.* v. *Miller, supra,* 215 Cal.App.3d at p. 1175;

Cal. Title Insurance Practice (Cont.Ed.Bar Supp. 1988) § 2.11, p. 14.) This is because " 'any title search or examination is performed by the insurer solely for the purpose of seeking to evaluate its underwriting decision in issuing the policy, not for the benefit of the insured.' [Citation.]" (*Fidelity National Title Ins. Co.* v. *Miller*, *supra*, at p. 1175; Cal. Title Insurance Practice, *supra*, § 5.27, p. 67.) In the words of the statute, "[a]ny such report shall not be construed as, nor constitute, a representation as to the condition of title to real property, but shall constitute a statement of the terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted." (Ins. Code, § 12340.11.)

One court has already held that Insurance Code sections 12340.10 and 12340.11 preclude liability where a title insurer negligently performs a search of the title to the property and fails to discover, or reflect in the preliminary report, an impediment to title. In *Southland Title Corp.* v. *Superior Court* (1991) 231 Cal.App.3d 530 [282 Cal.Rptr. 425], a title insurer's preliminary report failed to reflect a recorded flood control easement affecting the value of the property, and the purchasers brought suit. The court agreed with the defendant that in the wake of the enactment of sections 12340.10 and 12340.11 "[a] preliminary report, for which little or no charge is made, is merely the inducement to purchase a title policy. It will no longer be treated or considered to have the legal consequence of an abstract of title. If a current representation as to the status of title is required then an abstract can be ordered and separately purchased." (231 Cal.App.3d at p. 536, fn. omitted.) Despite the purchasers' argument "that in the everyday world of real estate transactions buyers and sellers continue to order and rely upon preliminary title reports as an integral part of the sale transaction," the court emphasized ". . . it is now clear that *such reliance cannot be justified and is done only at a party's peril.*" (*Id.* at p. 537, italics added and fn. omitted.)

The court went on to explain why this construction of the statutes carries out the intent of the parties to a real estate transaction. "The title insurer intends by the issuance of a preliminary report to provide only a represen- tation that a policy of title insurance will subsequently be issued insuring the title in the condition described in the preliminary report. The prospective insured *reasonably* concludes a transaction in reliance not on the preliminary report, but on the anticipated policy of title insurance. A title insurer expressly does not intend to induce a buyer or lender to consummate a transaction in reliance on a preliminary report of title. Title companies are in the business of issuing title insurance *policies*. They do not charge for preliminary reports, but their profits are derived from the premiums earned from selling insurance policies, where the amount of the premium is com- mensurate with the risk assumed. The issuer of a preliminary report merely

intends to induce the prospective insured to purchase a policy of title insurance and to declare in advance of such purchase precisely the risk which it will agree to assume." (*Southland Title Corp.* v. *Superior Court*, *supra*, 231 Cal.App.3d at p. 538, italics in original.)

More recently, the same conclusion was reached by the court in *Herbert A. Crocker & Co.* v. *Transamerica Title Ins. Co.* (1994) 27 Cal.App.4th 1722 [33 Cal.Rptr.2d 313], wherein it was stated: "The law is now clear that a preliminary report is not an abstract of title, and therefore does not carry rights, duties, or responsibilities associated with the preparation and issuance of such a document; the preliminary report is now deemed nothing more than an offer to issue a title policy. [Citations.] For this reason an action for negligence will no longer lie against a title insurance company on the basis of its representations in the preliminary report[.]"[6] (27 Cal.App.4th at p. 1727, fn. 6.)

In short, a title insurer prepares a preliminary report to limit its own risk—by locating and excluding items from coverage—and not on behalf of any party to a real estate transaction. A party who does not purchase title insurance may not rely on the title insurer to protect his or her interests or to disclose all detrimental information contained in the recorded files. Parties who desire protection against the possibility that negative information exists that was not revealed in the title insurer's search of the records must obtain title insurance. Insurance Code sections 12340.10 and 12340.11 leave no room for the existence of a duty of care based on the title company's search of records and issuance of a preliminary report and title insurance policy.

## II

The Seigels suggest that the result should be different in this instance because Fidelity was not acting simply as a title insurer but also performed certain escrow functions assigned it by DCE and was in effect a "sub-escrow" or "sub-agent" of the Seigels. The evidence established that Fidelity was engaged by DCE to hold the $150,000 loan proceeds, to pay them out at DCE's command, and to ensure the deeds were recorded. Fidelity was not given a copy of the written escrow instructions; it was given oral instructions by DCE and according to the uncontradicted testimony obeyed those instructions in precise accordance with their terms.

It is indisputably true that "[a]n escrow holder is the limited agent and fiduciary of all parties to an escrow" and that as such it has "a fiduciary

---

[6]The court went on to note that the statutes had no application to the case at hand "as they do not apply to preliminary reports issued before their effective date of January 1, 1982. [Citations.]" (*Herbert A. Crocker & Co.* v. *Transamerica Title Ins. Co.*, *supra*, 27 Cal.App.4th at p. 1728, fn. 6.)

duty 'to communicate to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction . . . .' " (*Kirby* v. *Palos Verdes Escrow Co., Inc.* (1986) 183 Cal.App.3d 57, 64 [227 Cal.Rptr. 785].) However, it is equally true that " 'the agency which exists (and the obligations pursuant thereto) is a limited one. "If the several escrow instructions create in the escrow holder an agency, it must be one limiting the obligations of the escrow holder to each party to the escrow in accordance with the instructions given by such party". . . . "[I]t is generally held that no liability attaches to the escrow holder for his failure to do something not required by the terms of the escrow or for a loss incurred while obediently following his escrow instructions. [Citations.]" ' " (*Hannon* v. *Western Title Ins. Co.* (1989) 211 Cal.App.3d 1122, 1128 [260 Cal.Rptr. 21]; *Schaefer* v. *Manufacturers Bank* (1980) 104 Cal.App.3d 70, 77-78 [163 Cal.Rptr. 402]; accord, *Lee* v. *Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921 [259 Cal.Rptr. 117] ["[T]he fiduciary relationship between plaintiff [purchaser] and defendant [escrow holder] is limited to defendant carrying out the escrow instructions . . . ."].)

■ If the agency and fiduciary responsibilities owed by DCE to the Siegels were limited by the terms of the escrow instructions, the responsibilities of Fidelity acting as sub-escrow were even more limited. (See *Dill* v. *Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1438 [29 Cal.Rptr.2d 746] ["Agents are not fungible. A person who is authorized to perform one function on behalf of a principal may have no authority at all regarding a different function."].) Fidelity was engaged to perform only the most rudimentary of the escrow functions—payout of funds and recordation of documents. It did not undertake to prepare or review the escrow documents or ensure that the parties' instructions were carried out. We decline to hold that a third party so engaged thereby becomes the fiduciary of the purchasers for purposes of searching the records or transmitting information regarding title.

### III

■ Of course the fact that a title insurer generally owes no duty to undertake a thorough search of the records or to disclose impediments to title does not mean that it would not be liable if it contracted to provide such a service. As the court said in *Southland*, ". . . a person who contracts for the written representation known as an 'abstract of title' will receive all of the rights associated with that written representation. . . . If negligently prepared, the abstractor obviously would be exposed to all liability which normally flows from the consequences of professional negligence." (231 Cal.App.3d at p. 536; see Ins. Code, § 12340.10.)

Here the trial court purported to find an agreement between Fidelity and DCE under which Fidelity promised to disclose *to DCE* all impediments to title. The evidence does not support any such finding. According to the uncontradicted testimony of both DCE's employee and Fidelity's title officer, Fidelity agreed only to prepare a preliminary title report and provide an ALTA lender's policy. No contract to prepare an abstract of title was created. To hold, as the Siegels suggest, that an agreement arose from custom and practice because recorded liens are usually discovered by the title company and ordinarily reported to the escrow agency would render Insurance Code sections 12340.10 and 12340.11 meaningless and lead to the improper reliance on the insurer's preliminary report the Legislature intended to foreclose. That a title insurer ordinarily reports discovered liens to the escrow company for its own benefit in order to reduce its own risk does not create a contractual obligation to do so in all situations and certainly not in this one.

## IV

In their cross-appeal, the Siegels urge that the trial court erred in refusing to put before the jury the contract claim set forth in its original complaint. The Siegels argue that evidence supported their claim that Fidelity breached a contract with the Siegels to provide title insurance. The Siegels point to the following factors to support the existence of such a contract. First, they told their agents, DCE and Marina Mortgage, that they wanted title insurance. Second, they paid $662.50 to Fidelity for the title insurance policy issued on behalf of the lender which they contended was a sufficient amount to purchase joint insurance. Third, the transmittal forms from DCE to Fidelity stated: " 'When recorded mail original title policy direct to buyer and copy with invoice for payment to escrow.' " Finally, respondents claim that "there was a reference in the escrow instructions that the property was to be transferred to the Siegels 'free from encumbrances' other than those excepted in the preliminary title report."

Reviewing each of these factors in turn, we first note that evidence of conversations between the Siegels and DCE or Marina Mortgage concerning title insurance will not support a claim against Fidelity in the absence of any suggestion that their substance was passed on to Fidelity. Concerning the amount paid for title insurance, the uncontradicted testimony of Jill Culver of Fidelity was that the $662.50 was the charge for *either* a lender's ALTA policy *or* an owner's ALTA policy, and that an additional $198.75 would have been charged for a joint owner's and lender's policy. A transmittal form directing a copy of the title policy to be sent to the buyer does not

create a policy in favor of the buyer or suggest, except in the most oblique fashion, that a policy in favor of the buyer was to be issued. Finally, the escrow instructions referenced do not state that the property is to be transferred to the Siegels "free from encumbrances" other than those excepted in the preliminary title report, but that "Funds may be used for account of the vestees, and you [meaning Fidelity and DCE] will record all instruments when you comply with the following: [¶] . . . [¶] 2. Issue said form of Policy free from encumbrances except items 1-4." The "said form of policy" is described earlier in the document as an "ALTA policy" with certain indorsements and was issued. None of these factors, either together or separately, support the existence of an agreement to provide title insurance in the wake of the uncontradicted testimony that DCE asked Fidelity to provide an ALTA lender's policy only.

### DISPOSITION

The judgment in favor of the Siegels and against Fidelity is reversed. On remand, the court is instructed to enter a judgment in favor of Fidelity. Fidelity is awarded its costs on appeal.

Vogel (C. S.), P. J., and Hastings, J., concurred.

A petition for a rehearing was denied June 26, 1996, and the petition of plaintiff and appellants for review by the Supreme Court was denied September 18, 1996.