[No. B217956. Second Dist., Div. Three. Aug. 10, 2010.]

BEN SOIFER, Plaintiff and Appellant, v.
CHICAGO TITLE COMPANY et al., Defendants and Respondents.

COUNSEL

Kneafsey, Tostado & Associates, Sean M. Kneafsey and Shaun Swiger for Plaintiff and Appellant.

Glaser, Weil, Fink, Jacobs, Howard & Shapiro, Joel N. Klevens and Diane K. Myint for Defendants and Respondents.

OPINION

**CROSKEY, Acting P. J.**—In this case, plaintiff and appellant, Ben Soifer, appeals a judgment entered after the trial court sustained a demurrer to his first amended complaint without leave to amend. In *Southland Title Corp. v. Superior Court* (1991) 231 Cal.App.3d 530 [282 Cal.Rptr. 425] (*Southland*), we held that a title company could not be held liable for the negligent preparation of a preliminary report of title. Rather, if a representation was sought from the title company as to the condition of the title to a particular property, an abstract of title should have been obtained. Here, plaintiff neither sought, obtained nor desired a policy of title insurance or an abstract of title, but nonetheless seeks to hold the respondent, Chicago Title Company (Chicago), liable in both tort and contract for alleged negligence and misrepresentations with respect to the seniority status of encumbrances on certain properties that were in the process of trust deed foreclosure.

We adhere to our analysis in *Southland* and extend and apply it here to the several claims asserted by plaintiff. We hold that a plaintiff cannot recover for

errors in a title company's statements regarding the condition of title to a property in the absence of a policy of title insurance or the purchase of an abstract of title. We therefore will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

As this case comes to us on demurrer, we accept as true the facts alleged by plaintiff in his complaint. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Essentially, plaintiff alleges that in late 2007, he was an investor in distressed real estate. His business plan involved the purchase of real properties that were being foreclosed upon by mortgage holders. In order to decide whether to bid on a particular property, he needed to know if the foreclosing lender was in fact the senior lender on that property. Put another way, if he made a successful bid at a foreclosure sale and the foreclosing lender held a secured position junior to other more senior liens, then plaintiff's title would be subject to such liens.

In order to avoid such a result, plaintiff alleges that he entered into an oral agreement with Chicago's agent, Miguel Escutia, in which it was agreed that Escutia, on behalf of Chicago, would provide title information upon which plaintiff would rely in deciding whether to make a bid at a particular foreclosure sale. In exchange, plaintiff alleges that he agreed that he would place business with Chicago upon the subsequent resale of the foreclosed properties. The information that plaintiff wanted from Chicago was limited, specific and time sensitive. He needed, usually within 24 hours before a particular foreclosure sale, a "yes" or "no" answer to the question of whether a particular designated foreclosing loan was a senior lien.

Plaintiff emphasizes he neither sought nor obtained a "preliminary title report." What he sought and what Escutia allegedly provided were simple short e-mail answers to his questions as to the senior status of multiple loans. Other than his promise of future title insurance business, plaintiff neither paid nor agreed to pay for these services.

On March 6, 2008, plaintiff requested seniority information as to a loan that was being foreclosed upon a property located on Woodley Avenue in Encino, California. Through Escutia, Chicago allegedly informed plaintiff that the foreclosing loan (in the amount of $990,000) was in a senior position. In fact, it was junior to a first deed of trust held by Citimortgage, Inc., in the sum of $1.6 million.

Plaintiff alleges that, in reliance on Chicago's one-word "yes" e-mail response to his inquiry about the Woodley loan, he submitted a bid at the

foreclosure sale on March 11, 2008, in the sum of $1,000,000.01. He further alleges that he was only able to sell the property for $1.2 million and, after negotiating a reduction in and then paying the balance remaining on the senior Citimortgage lien, he sustained a loss in the sum of $1 million.

He then brought this action against Chicago for negligence and negligent misrepresentation. After Chicago successfully demurred to the original complaint, plaintiff filed his first amended complaint which added causes of action for breach of oral contract and so-called "abstractor negligence." The first amended complaint is the operative pleading in this matter. Chicago again demurred. The trial court agreed with Chicago's arguments and sustained the demurrer without leave to amend.

Relying primarily on two cases, *Southland, supra,* 231 Cal.3d 530 and *Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181 [54 Cal.Rptr.2d 84] (*Siegel*), as well as two important statutes (Ins. Code, §§ 12340.10, 12340.11), the trial court reasoned that since plaintiff had neither sought nor obtained a policy of title insurance or an abstract of title, Chicago had no liability to plaintiff on any theory.

Plaintiff has prosecuted a timely appeal.

### CONTENTIONS OF THE PARTIES

Plaintiff argues that the information requested from Chicago did not constitute a preliminary report of title, but rather were the services of an "abstractor" with respect to which plaintiff and Chicago had entered into an enforceable oral contract and that those services had been negligently performed resulting in damage to plaintiff. Plaintiff contends that those circumstances support his alleged negligence, breach of contract and negligent misrepresentation claims. Finally, plaintiff contends that the trial court should have granted him leave to allege a fraudulent concealment cause of action.

Chicago argues in response that a title company can only be liable for negligently misstating the status of a title if it issues an "abstract of title" and the informal communications involved in this case were not proper abstracts. Those circumstances, Chicago argues, effectively defeat all of plaintiff's asserted or proposed causes of action. We agree with Chicago.

### DISCUSSION

1. *The Nature of Plaintiff's Claim*

The allegations of, and exhibits attached to, plaintiff's complaint make clear that he claims a contractual relationship existed between him and

Chicago, which called for a very informal and limited provision of title information by Chicago. Plaintiff would supply a property address and loan number of a pending foreclosure sale to Escutia, who would provide a "yes" or "no" answer to the question of the loan's seniority. As already explained, plaintiff's need for information was extremely time sensitive.

Plaintiff's basis for recovery, whatever the theory of a particular cause of action, rests entirely upon the proposition that such an informal arrangement could, as a matter of law, result in abstractor liability to Chicago. Put another way, plaintiff does not claim that he sought or requested a policy of title insurance from Chicago.[1] What he essentially does claim is that the agreement that he claims to have entered into with Chicago amounted to an undertaking by Chicago to act as an abstractor and the informal e-mail responses to plaintiff's multiple inquires as to loan title status constituted abstracts of title, the negligent preparation of which subjected Chicago to liability.

## 2. *Relevant Statutory Provisions*

The Legislature has, in the Insurance Code, made specific provision for the conduct of the business of title insurance. Several of those statutory provisions are relevant to the issues presented in this case.

Section 12340.1 defines "title insurance" to mean "insuring, guaranteeing or indemnifying owners of real or personal property or the holders of liens or encumbrances thereon or others interested therein against loss or damage suffered by reason of: [¶] (a) Liens or encumbrances on, or defects in the title to said property; [¶] (b) Invalidity or unenforceability of any liens or encumbrances thereon; or [¶] (c) Incorrectness of searches relating to the title to real or personal property."

Section 12340.2 defines "title policy" to mean "any written instrument or contract by means of which title insurance liability is assumed."

Section 12340.10 states that an "abstract of title" is a *"written representation,* provided pursuant to a contract, whether written or oral, intended to be relied upon by the person who has contracted for the receipt of such representation, *listing all recorded conveyances, instruments or documents* which, under the laws of this state, impart constructive notice with respect to the chain of title to the real property described therein. An abstract of title is not a title policy as defined in Section 12340.2." (Italics added.)

---

[1] Indeed, plaintiff argued in his opposition to Chicago's demurrer to his first amended complaint, "This case has nothing to do with title insurance, the offer to buy title insurance, or the issuance of a preliminary title report."

Finally, in section 12340.11, the terms "preliminary report," "commitment" and "binder" are defined as "reports furnished in connection with an application for title insurance and are offers to issue a title policy subject to the stated exceptions set forth in the reports and such other matters as may be incorporated by reference therein. The reports are not abstracts of title, nor are any of the rights, duties or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report. Any such report shall not be construed as, nor constitute, a representation as to the condition of title to real property, but shall constitute a statement of the terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted."

■ Prior to the enactment of Insurance Code sections 12340.10 and 12340.11, case law had held that a preliminary title report is the equivalent of an abstract of title, and that a title insurer could be liable in negligence for its failure to list all recorded encumbrances in a preliminary title report. (*Southland, supra,* 231 Cal.App.3d at p. 535.) However, in 1981, the Legislature enacted Insurance Code sections 12340.10 and 12340.11 in order to "make a formal distinction between" a preliminary title report and an abstract of title. (*Southland, supra,* 231 Cal.App.3d at p. 536.) From that time onward, a preliminary title report "[would] no longer be treated or considered to have the legal consequence of an abstract of title. If a current representation as to the status of title is required then an abstract can be ordered and separately purchased." (*Ibid.*) The change in law was sought by the California Land Title Association. (Sen. Com. on Insurance and Indemnity, Analysis of Assem. Bill No. 334 (1981–1982 Reg. Sess.) as amended Apr. 29, 1981.) It was deemed necessary in order to "assure that the title insurers are able to charge appropriate premiums for foreseeable liablity, rather than as [was] the case under [then] current case law. Since the premiums or fees charged for preliminary reports are much less than those for abstracts, the result of such decisions [was] to impose liability on the insurers to an extent beyond which they have computed the premium charge (i.e., an unfunded liability)." (Cal. Dept. of Insurance, Enrolled Bill Rep. on Assem. Bill No. 334 (1981–1982 Reg. Sess.) prepared for Governor Brown (May 30, 1981) p. 2.)

3. *Plaintiff's Claim Does Not Provide a Basis for Holding Chicago Liable for Breach of Contract, Negligence or Fraudulent Concealment*

Nearly 20 years ago, we held in *Southland* that the failure of a preliminary report of title to disclose an easement could not serve as the basis for "abstractor negligence" against the title company. The plaintiff had purchased a policy of title insurance, which insured a property purchase price of $92,000. When a defect in title was discovered which allegedly caused

$100,000 in damages, the plaintiffs sought to recover the additional damages in a cause of action for negligent preparation of the preliminary title report, which had failed to disclose the defect. (*Southland, supra*, 231 Cal.App.3d at p. 533.)

■ We summarized the impact of the Legislature's enactment of Insurance Code sections 12340.10 and 12340.11: "[t]he Legislature can set public policy for a state through its enactments [citation], and here the Legislature has determined to make a formal distinction between an 'abstract of title' and a policy of title insurance. It is only in connection with the latter document that a 'preliminary report' of title is issued. No longer will these two separate and distinct transactions be intermingled as they have been by prior case law. [Citation.] [¶] A preliminary report, for which little or no charge is made, is merely the inducement to purchase a title policy. It will no longer be treated or considered to have the legal consequence of an abstract of title. *If a current representation as to the status of title is required then an abstract can be ordered and separately purchased.* [¶] The effect of section 12340.10 is to make clear that a person who contracts for the written representation known as an 'abstract of title' will receive all of the rights associated with that written representation. Such a purchased and express representation can be relied upon. If negligently prepared, the abstractor obviously would be exposed to all liability which normally flows from the consequences of professional malpractice." (*Southland, supra*, 231 Cal.App.3d at p. 536, fn. omitted, italics added.)

Plaintiff seeks to avoid the consequences of cases like *Southland* by claiming his agreement with Chicago was, in legal effect, a contract for an "abstract of title." That contention, however, runs up against the plain statutory definition of an abstract as set out in Insurance Code, section 12340.10: ". . . *a written representation . . . listing all recorded conveyances, instruments or documents* which . . . impart constructive notice with respect to the chain of title . . . ." (Italics added.) Plaintiff, by his own pleading, neither sought nor agreed to pay for such an abstract. He sought only quick one-word answers to his very time-sensitive inquiries about specific foreclosing loans that he had already identified.[2] As Chicago argues, plaintiff sought a

---

[2] In plaintiff's original complaint, he alleged, "In exchange for receiving [plaintiff's] business when the property was subsequently sold, Chicago Title agreed to research and provide information regarding the properties for [plaintiff] to rely upon in deciding whether to purchase the properties. This information most notably included whether the properties were being foreclosed upon by a junior or senior lender." In his first amended complaint, plaintiff alleged, "In exchange for receiving [plaintiff's] business when the property was subsequently sold, Chicago Title agreed to research and provide *chain of title* information regarding the properties for [plaintiff] to rely upon in deciding whether to purchase the properties. . . . [*Plaintiff*] *requested, and Escutia agreed, to provide* [plaintiff] *with a written representation as to whether there were any recorded conveyances, instruments, or documents on the subject*

quick look at the public record at no cost to him except for the vague "promise" of some undefined future business. The trial court saw it the same way. "You have made a title insurance company a super guarantor of your trustee sale transaction. I don't think there is any possible way for that duty to be imposed in this case."

 By virtue of artful pleading, plaintiff seeks to recharacterize a very informal, almost casual, arrangement into a formal legal commitment. In doing so, he seeks to place himself in a better position than a party who requests and relies on a preliminary report of title. But if a party who relies on such a report is unable to hold the title company liable as an abstractor (*Southland, supra,* 231 Cal.App.3d at pp. 536–537), there would appear to be no basis on which plaintiff can do so. While plaintiff concedes that abstractor liability is no longer available as a basis for recovering damages resulting from an inaccurate preliminary title report, he seeks the same abstractor liability for a *lesser* document. A quickly prepared one-word e-mail, for which Chicago did not compute and charge a premium, which in no way meets the statutory definition of an abstract of title, simply cannot support a cause of action for abstractor negligence. "[A] *title insurer who has not undertaken to perform as an abstractor owes no duty to disclose recorded liens or other clouds on title.*" (*Siegel, supra,* 46 Cal.App.4th at pp. 1189–1190, italics added.)

The *Siegel* and *Southland* courts, in rejecting a plaintiff's attempt to rely on a preliminary report of title where no policy of title insurance had been purchased, succinctly summarized the state of the law applicable here: "In short, a title insurer prepares a preliminary report to limit its own risk—by locating and excluding items from coverage—and not on behalf of any party to a real estate transaction. A party who does not purchase title insurance may not rely on the title insurer to protect his or her interests or to disclose all detrimental information contained in the recorded files. *Parties who desire protection against the possibility that negative information exists that was not revealed in the title insurer's search of the records must obtain title insurance.* Insurance Code sections 12340.10 and 12340.11 leave no room for the existence of a duty of care based on the title company's search of records and

---

*properties that would adversely affect [plaintiff's] ability to take clean title at a foreclosure sale. This included, but was not limited to, any superior title interest including, but not limited to, superior lien holders, such as tax or mechanics liens. The most important information, however, was whether the property was being foreclosed upon by a junior or senior lender because this was the most obvious potential title defect.*" (Italics added.) While plaintiff's amended pleading attempts to fall squarely within the statutory definition of an abstract, the documents attached to the complaint clearly demonstrate that plaintiff sought only a one-word "yes" or "no" answer as to whether the loan being foreclosed upon was the senior encumbrance. Indeed, plaintiff often proceeded by sending Escutia a prepared spreadsheet which included a column labelled, "Is This The Senior Trust Deed (1st) Yes or No" and asking him to simply put a "yes" or "no" in that column.

issuance of a preliminary report and title insurance policy." (*Siegel, supra*, 46 Cal.App.4th at p. 1193, italics added.) A party that seeks to hold an insurer liable for negligently providing title information upon which the party relied must obtain an abstract of title. "If a current representation as to the status of title is required then an abstract can be ordered and separately purchased." (*Southland, supra*, 231 Cal.App.3d at p. 536.)

■ In short, there are two ways in which an interested party can obtain title information upon which reliance may be placed: an abstract of title or a policy of title insurance. Having purchased neither, plaintiff cannot recover in this case.

On appeal, plaintiff argues that business realities often require the purchase of something less than a complete abstract of title, and that an affirmance in this case would mean that there would be no way in which a property buyer and a title insurer could voluntarily contract for the insurer to provide limited title information for which the insurer would be liable if the information was in error. We disagree. We believe Insurance Code section 12340.1 defines "Title Insurance" in such a way as to permit such an agreement. Title insurance is "insuring, guaranteeing or indemnifying owners of real . . . property . . . against loss or damage suffered by reason of: [¶] (a) Liens or encumbrances on, or defects in the title to said property; [¶] . . . or [¶] (c) Incorrectness of searches relating to the title to real . . . property." (Ins. Code, § 12340.1.) In other words, if plaintiff sought an agreement indemnifying him against loss or damage suffered by reason of an additional senior encumbrance on the Woodley Avenue property, or guaranteeing against the incorrectness of Escutia's quick search of the records pertaining to title to that property, he could have purchased a policy of title insurance from Chicago. Having failed to do so, he cannot obtain the benefits he would have received from an insurance policy for which he never paid a premium.[3]

Finally, plaintiff argues that he should have been allowed leave to amend his complaint to allege a new cause of action for concealment. He contends that he can allege that Chicago concealed its belief that it was under no obligation to provide accurate information. Such allegations appear to be inconsistent with his current pleading and, in any event, do not state a proper cause of action for fraud.[4] The trial court properly denied plaintiff leave to file such amended pleading.

---

[3] "Title companies are in the business of issuing title insurance *policies*. They do not charge for preliminary reports, but their profits are derived from the premiums earned from selling insurance policies, where the amount of the premium is commensurate with the risk assumed." (*Southland, supra*, 231 Cal.App.3d at p. 538.)

[4] It is apparent that Escutia did not haphazaradly insert the words "yes" and "no" randomly into plaintiff's spreadsheets, on the basis that it had no obligation to provide accurate information to plaintiff. Clearly, Escutia endeavored to provide correct information and,

## *DISPOSITION*

The judgment is affirmed. Chicago shall recover its costs on appeal.

Kitching, J., and Aldrich, J., concurred.

On August 13, 2010, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 27, 2010, S186491. Corrigan, J., did not participate therein.

---

perhaps due to the time pressure, simply made a mistake. Indeed, as the *Siegel* court stated, "The records pertaining to real property are complex and encumbrances may be missed by even the most thorough search. Title insurance is an acknowledgment that errors may have been made." (*Seigel, supra*, 46 Cal.App.4th at p. 1191.) That Chicago has no legal liability for Escutia's mistake in the absence of a title insurance policy or abstract of title does not give rise to a cause of action for fraudulent concealment.