[No. E018195. Fourth Dist., Div. Two. Feb. 17, 1999.]

65 BUTTERFIELD, Plaintiff and Appellant, v.
CHICAGO TITLE INSURANCE COMPANY, Defendant and Respondent.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976(b), this opinion is certified for publication with the exception of part II.B.

**COUNSEL**

Greenberg, Glusker, Fields, Claman & Machtinger and Garrett L. Hanken for Plaintiff and Appellant.

Gibbs, Giden, Locher & Acret, Anya Stanley; Greines, Martin, Stein & Richland, Robin Meadow and Jennifer L. King for Defendant and Respondent.

**OPINION**

**RICHLI, J.**—Appellant 65 Butterfield, a California Limited partnership (Butterfield), brought this action on a title insurance policy issued by respondent Chicago Title Insurance Company (Chicago) after the County of Riverside (County) claimed an easement on property owned by Butterfield. The lower court ruled there was no coverage under the policy, and, in any event, the statute of limitations had expired. The court also awarded Chicago its expert costs and attorney fees pursuant to section 998 and former section 1021.1 of the Code of Civil Procedure.

We affirm the judgment based on the statute of limitations. We also uphold the award of fees and costs.

# I

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The 1966 CCR's*

The subject property consists of 65 acres suitable for residential development which adjoin Butterfield Stage Road, a major arterial public highway. In November 1966, Rancho California, which then owned the property, recorded a declaration of covenants, conditions and restrictions (1966 CCR's) covering the property. In relevant part, the 1966 CCR's provided: "Slope easements at a ratio of 2:1 are reserved for improvement of streets to ultimate standards."

### B. *The 1969 Grant Deed*

In December 1969, Rancho California conveyed the property to John K. Trotter and other parties by grant deed (1969 Grant Deed). The 1969 Grant Deed provided that the conveyance was subject to "[c]ovenants, conditions, restrictions, rights of way and easements of record or apparent." The legal description of the property attached to the 1969 Grant Deed provided for a 110-foot "easement for Roadway and Public Utility purposes," and further stated: "Grantor hereby reserves the right to dedicate Roadway Access Easement (i) herein above described, for roadway and utility purposes, *together with* slope easements *adjoining* said Roadway Access Easement (i) at a ratio of 2:1 as required by governmental agencies." (Italics added.)

### C. *The 1973 Certificate of Dedication*

In January 1973, Kaiser Aetna, a successor to Rancho California, recorded a certificate of dedication (1973 Certificate of Dedication) in which Kaiser Aetna offered in perpetuity to dedicate "for public use as easements for road and utility purposes" a certain described portion of the property, "*together with* slope easements *adjoining* at a ratio of 2 horizontal to 1 vertical; . . ." (Italics added.) The described portion of the property included a 55-foot strip running from the center line of the right-of-way for Butterfield Stage Road.

### D. *The 1989 Resolution of Acceptance*

In June 1989, the County recorded a resolution accepting offers of dedications for public roads, "for the purpose of vesting title in the County of Riverside" (1989 Resolution of Acceptance). The resolution covered Butterfield Stage Road, as "described in Declaration of Dedications recorded January 22, 1973," i.e., the 1973 Certificate of Dedication.

E. *The 1990 Acquisition of the Property by Butterfield*

By grant deed recorded January 1990, Butterfield acquired the property. The deed stated the conveyance was subject to "all covenants, conditions, restrictions, easements and other matters of record," including matters listed on an attached document. The attachment listed "Permitted Title Exceptions," and included "Declaration of Covenants, Conditions and Restrictions, dated November 18, 1966, by Rancho California," i.e., the 1966 CCR's. It also listed proposed street improvement plans prepared for an assessment district (AD-159) which the County had organized in 1988 to construct Butterfield Stage Road.

In connection with the acquisition, Butterfield purchased a title policy from Chicago, which insured against "loss or damage . . . sustained or incurred by the insured by reason of [¶] . . . [¶] [a]ny defect in or lien or encumbrance on the title." The policy excluded from coverage loss or damage arising by reason of the 1966 CCR's. However, it neither mentioned nor excluded from coverage loss or damage arising from the 1969 Grant Deed, 1973 Certificate of Dedication, or 1989 Resolution of Acceptance. (The parties refer to the latter three documents as the "Omitted Documents," and we will use the same terminology.)

F. *Background of the Present Controversy*

After establishing AD-159, the County commenced work on Butterfield Stage Road. On October 11, 1990, David Pearson, the general partner of Butterfield, wrote a letter to the County asserting that a large culvert had been constructed under Butterfield Stage Road which protruded onto Butterfield's property. Pearson asserted he had "researched all recorded documents" with respect to the property and had found no easement for the culvert. Pearson referred to the construction of the culvert as a "significant error," stated that he disapproved strongly of the culvert being placed on his property, and requested "immediate rectification."

By letter dated October 17, 1990, Ivan Tennant of the County's transportation department responded to Pearson's letter. Tennant stated that Kaiser Aetna's dedication included a blanket (i.e., indeterminate) easement for slopes adjoining Butterfield Stage Road which also authorized construction of a storm drain. According to Tennant, the easement gave the County the right to construct slopes abutting and extending beyond the roadway itself, onto the adjoining property, as needed to bring the grade down to the level of the surrounding land.

Thereafter, Butterfield met with the County on several occasions, but the controversy was not resolved. In July 1993 Butterfield commenced this

action against the County. Originally, the complaint did not name Chicago as a defendant, but Butterfield amended it in 1994 to do so. In its final form, the complaint alleged the County in 1981 had approved a final subdivision map and street improvement plans for the tract including the Butterfield property which showed no dedications for slope easements on the Butterfield property itself, but instead indicated the slopes adjoining Butterfield Stage Road would be confined to the roadway right-of-way. Subsequently, however, the County had established AD-159 and had approved street improvement plans calling for slopes extending *beyond* the right-of-way, onto Butterfield's property. As constructed, the road was about 20 feet higher than as shown on the 1981 plans, and the slopes extended beyond the right-of-way by 80 to 100 feet.

Based on these allegations, Butterfield alleged the County had made it impossible for Butterfield to develop the property in accordance with the 1981 plans. Butterfield sought compensation from the County by way of inverse condemnation. Butterfield also asserted a claim against Chicago for breach of contract, alleging that the title policy was defective in failing to identify the Omitted Documents and that those documents constituted an encumbrance on the property which diminished its value.

### G. *Lower Court Rulings*

The matter was tried to the court, without a jury, in two phases. In the first phase, the court determined that the slope easements authorized by the 1969 Grant Deed were not limited to the road right-of-way, but included as much of the adjoining property as was necessary to achieve the proper slope ratio without reducing the 110-foot width of the road. The court found that the language of the 1969 Grant Deed making the conveyance subject to the right to dedicate the roadway easement, "together with" slope easements "adjoining" the roadway easements meant the slope easements were intended to extend beyond the roadway, not to be confined within the roadway. Accordingly, the court entered judgment in favor of the County on Butterfield's inverse condemnation claim. Butterfield does not challenge that ruling on appeal.

In the second phase, the court ruled there was no coverage under the Chicago policy for the slope easements, because the policy expressly excepted from coverage any interest arising from the 1966 CCR's, and the slope easements ultimately reserved and dedicated in the Omitted Documents were the same as the slope easements reserved in the 1966 CCR's. The court also ruled that, in any event, the two-year statute of limitations (Code Civ. Proc., § 339, subd. 1) had expired before Butterfield brought suit.

The court found Butterfield's claim on the policy accrued when it received Tennant's October 17, 1990, letter. At that point, Butterfield knew the slopes encroached on its property and knew the County claimed an easement to construct the slopes in that location based on the Omitted Documents. Accordingly, the court entered judgment for Chicago on Butterfield's breach of contract claim.

Subsequently, the court granted Chicago's motion for attorney fees in the amount of $17,077, pursuant to former Code of Civil Procedure section 1021.1, based on Butterfield's rejection of Chicago's pretrial settlement offer made under Code of Civil Procedure section 998. It also awarded Chicago expert witness fees in the amount of $67,500.65, pursuant to section 998.

II

DISCUSSION

A. *Statute of Limitations*

1. *Accrual of Cause of Action*

a. *Statutory Provisions*

Code of Civil Procedure section 339, subdivision 1 (section 339(1)) provides that an action on a policy of title insurance must be brought within two years of its accrual. It is not disputed that Butterfield made no claim on the title policy until September 1993 and did not name Chicago as a defendant until August 1994. Therefore, even assuming the statute was tolled from the time Butterfield tendered its claim to Chicago (see discussion, *post*), if the claim accrued before September 1991, it was barred.

Section 339(1) provides that a cause of action on a title policy "shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder." Case authority holds that this provision " '. . . refers to discovery, not to the date when discovery would have been possible.' " (*Contini* v. *Western Title Ins. Co.* (1974) 40 Cal.App.3d 536, 548 [115 Cal.Rptr. 257], quoting *Hansen* v. *Western Title Ins. Co.* (1963) 220 Cal.App.2d 531, 538 [33 Cal.Rptr. 668, 98 A.L.R.2d 520].)[1]

The parties appear to agree that the rule for determining when a cause of action accrues under section 339(1) is correctly stated in *Tabachnick* v. *Ticor*

[1]Chicago argues the rule stated in *Contini* and *Hansen*, that actual rather than constructive discovery is required, has been abrogated. Chicago points to later authority holding as a general matter, though not specifically in the title insurance context, that ". . . the uniform

*Title Ins. Co.* (1994) 24 Cal.App.4th 70 [29 Cal.Rptr.2d 59]. In that case, the court noted prior authority holding that a cause of action on a certificate of guaranty accrues upon " 'discovery of the loss that may be incurred if the title is not as represented in the certificate.' " (*Id.,* at p. 77.) It held: "The conclusion that the cause of action on a certificate of guaranty accrues when the holder of the certificate *discovers the potential loss* applies equally to a policy of title insurance . . . ." (*Ibid.*) Thus, the question in this case is when Butterfield discovered the loss arising from the County's easement claim.

### b. *Discovery of Loss*

■ " '[R]esolution of the statute of limitations issue is normally a question of fact . . . .' " (*Romano* v. *Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) ■ As stated, the lower court found Butterfield's cause of action accrued when Butterfield received Tennant's letter of October 17, 1990. Butterfield does not dispute that, when it received the letter, it knew the County's construction had encroached on its property and that the construction was undertaken pursuant to the County's claim of right. Butterfield argues, however, that its awareness of these facts was not sufficient to constitute discovery of the loss for purposes of section 339(1). Rather, Butterfield argues, because section 339(1) provides that a claim on a title policy accrues upon "discovery of the loss or damage suffered by the aggrieved party <u>thereunder,</u>" there is no accrual until the insured becomes aware of facts showing the loss is covered *under the policy.* Thus, Butterfield asserts, accrual requires "discovery of facts that show that the adverse claim is of <u>title,</u> founded on <u>matters of record,</u> <u>other than</u> those <u>expressly excepted</u> in the title policy, . . ." Butterfield contends it did not have knowledge of such facts until May 1994, when the County identified the Omitted Documents as the basis of its claim to the slope easements.

■ As a general matter, ". . . it is the discovery of facts, not their legal significance, that starts the statute." (*Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1113 [245 Cal.Rptr. 658, 751 P.2d 923].) Thus, "[i]t is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action." (*Gutierrez* v. *Mofid, supra,* 39 Cal.3d 892, 898.) Consistent with that principle, numerous decisions hold that an insured need not be aware a loss may be covered by the policy before the statute of

California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, *or should have learned,* the *facts* essential to his claim." (*Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 897 [218 Cal.Rptr. 313, 705 P.2d 886], first italics added.) Because, as stated *post,* we conclude Butterfield actually discovered the loss or damage in this case more than two years before it tendered its claim on the policy, it is not necessary for us to resolve the issue Chicago raises.

limitations will begin to run. In *Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1143 [271 Cal.Rptr. 246], for example, the court stated: "An insured who is aware of the essential facts cannot toll the statute of limitations by contending he only belatedly discovered his policy might provide coverage . . . ." (*Id.*, at p. 1143.) Similarly, in *Abari* v. *State Farm Fire & Casualty Co.* (1988) 205 Cal.App.3d 530 [252 Cal.Rptr. 565], the court stated: ". . . Abari's belated discovery in 1984 that his homeowners' policy might afford coverage is without import. 'It is the occurrence of some . . . cognizable event rather than knowledge of its legal significance that starts the running of the statute of limitations.' " (*Id.*, at p. 535; see also *State Farm Fire & Casualty Co.* v. *Superior Court* (1989) 210 Cal.App.3d 604, 607 [258 Cal.Rptr. 413].)

Butterfield argues decisions involving other types of insurance (such as, presumably, *Love*, *Abari*, and *State Farm*, which involved homeowners policies) should not control in the title insurance context. Butterfield asserts that title defects, unlike physical damage to property, are not readily apparent to the insured since most insureds lack the resources and expertise for reviewing title. Consequently, Butterfield asserts, in the title insurance context, discovery should not be deemed to occur until the insured is aware not only of the relevant facts, but also that those facts give rise to a claim under the policy.

We are aware of no authority holding that title insurance claims are subject to the heightened discovery standard Butterfield advocates. Conceivably, *Tabachnick* v. *Ticor Title Ins. Co.*, *supra*, 24 Cal.App.4th 70, might be read to imply a requirement that the insured understand the extent of the policy's coverage before "discovery" of a loss can occur. As noted previously, the court in that case relied by analogy on authority holding that a cause of action on a certificate of guaranty accrues upon " 'discovery of the loss that may be incurred *if the title is not as represented in the certificate.*' " (*Id.*, at p. 77, italics added.) Since the title "as represented in" a title insurance policy is subject to whatever exceptions and exclusions are set forth in the policy, it could be argued that an insured must understand the limits of the policy's coverage in order to comprehend what loss may be incurred if the title is not "as represented." However, we need not resolve the question, because, as we now discuss, the record demonstrates Butterfield knew more than two years before tendering its claim that the County asserted a claim adverse to Butterfield's title, and that the claim was founded on record documents not excepted from the policy and, therefore, might be covered.

c. *Facts Showing Butterfield's Awareness of Omitted Documents*

First, Tennant's letter of October 17, 1990, in which he asserted the County's right to the slope easements, expressly referred to the recorded

tract map (No. 10429) for the property and asserted that "[a]ccording to the records furnished for the tract at the time of recordation, Butterfield Stage Road was a dedicated right-of-way. This dedication was made by Kaiser Aetna Corporation." The tract map, which was recorded in May 1981, expressly noted the existence of "an easement for roads, utilities, and slopes at a 2:1 ratio in favor of Rancho California, a partnership, *recorded on Dec. 31, 1969. Inst. # 132586*." (Italics added, capitalization altered.) The 1969 Grant Deed was recorded on December 31, 1969, as instrument No. 132586. Thus, it was apparent from the tract map that the 1969 Grant Deed was the source of the slope easement.

Even before Tennant's letter, Butterfield was aware of the contents of the tract map. Gerald Lushing, the limited partner of Butterfield when it acquired the property, testified as follows:

"Q. When you went out to take a look at the property before the close of escrow, did you take with you the tract map for 10429?

"A. Probably, yes. Yes, I believe we [i.e., Lushing and Pearson] did."

Lushing further confirmed that he and Pearson examined the tract map before Butterfield bought the property:

"A. We didn't do a survey, and looking at our street plans would show the slope, but the slope being outside of our boundary, we made the assumption that the slope we were looking at was outside of our boundary and was that slope shown on your plans.

"Q. Now, the plans that you're talking about are the—*is that the tract map* for 10429?

"A. No, *it would be that in combination with* the street plans." (Italics added.)

Butterfield notes that the tract map was expressly excepted from coverage in the policy, and asserts that awareness of the map's contents therefore could not provide notice that the easement indicated on the map might be covered by the policy. The obvious flaw in this argument is that the map expressly referred to the 1969 Grant Deed by date of recordation and instrument number. The 1969 Grant Deed, of course, was not excepted from coverage.

In fact, not only did the tract map plainly indicate the 1969 Grant Deed was the source of the easement, the County *expressly* so stated well over two

years before Butterfield asserted its claim. Donald Lohr, a civil engineer retained by Butterfield, testified that, at a meeting in January 1991, Tennant stated "that the county did have a valid slope easement," and referred to "a Kaiser-Aetna slope easement." Lohr further testified that Tennant stated "that the county's position concerning slope easements *was based upon the 1969 grant deed which is referenced in delta three on the tract map for 10429.*" (Italics added.)

Moreover, as stated previously, Pearson expressly asserted in his October 11, 1990, letter to the County that he had "researched all recorded documents with respect to this property . . . ."[2] The tract map, 1969 Grant Deed, 1973 Certificate of Dedication, and 1989 Resolution of Acceptance all were recorded documents. Tennant's reference to the tract map and Kaiser Aetna dedication in his October 1990 letter, and his reference at the January 1991 meeting to the tract map, 1969 Grant Deed and a "Kaiser-Aetna slope easement," made it abundantly clear not later than January 1991 that the County's easement claim was based on the Omitted Documents, specifically the 1969 Grant Deed and the 1973 Certificate of Dedication recorded by Kaiser Aetna.

### d. *Butterfield's Awareness That the Omitted Documents Were Not Excepted*

It was equally clear to Butterfield that the Omitted Documents were not excepted from coverage under the title policy. Although, as discussed *post*, Butterfield contended it did not receive a copy of the policy until April 1992, the record shows Butterfield was advised well before that time—before, in fact, it purchased the property—what matters would be excepted from coverage.

The purchase agreement, dated July 10, 1989, provided that title would be conveyed to Butterfield[3] "free of liens, encumbrances, easements, restrictions, rights and conditions of record," *other than* "permitted title exceptions set forth in Schedule 'A' hereto." The agreement further provided that the sellers would obtain and deliver to Butterfield a preliminary title report and commitment for issuance of a title policy from Ticor Title Insurance Company, Chicago's predecessor in interest on the policy. Matters listed on schedule "A," however, would be deemed permitted title exceptions.

---

[2]Butterfield argues the lower court did not rely on Pearson's letter, because otherwise it would have found the statute of limitations expired on October 11, 1990, instead of October 17, 1990, the date of Tennant's letter. The distinction is strained; Tennant's letter responded to Pearson's, and the court no doubt considered both in concluding Butterfield discovered its cause of action on October 17.

[3]The agreement listed as buyer "David Pearson and/or Assignees." For convenience, we will refer to Butterfield as the buyer.

Schedule "A" listed numerous matters of record, including the 1966 CCR's. Notably, the list did *not* include the 1969 Grant Deed or the other Omitted Documents.

In August 1989, Ticor issued a preliminary title report stating it was prepared to issue a policy insuring the property against "any defect, lien or encumbrance not shown or referred to as an exception below . . . ." Again, the list of exceptions did *not* include the 1969 Grant Deed or the other Omitted Documents.

Butterfield's principals were aware of the list of excepted matters. Pearson testified it would have been his customary practice "to review all of the matters shown in the Permitted Title Exceptions as well as those matters shown in the preliminary report." He also testified that, prior to close of escrow, he provided Lushing with a copy of the purchase agreement "setting forth the title exceptions."[4]

e. *Butterfield's Awareness That the County's Claim Was Adverse to Butterfield's Title*

Butterfield makes several arguments suggesting that, even if it knew of the contents of the tract map and the 1969 Grant Deed, that knowledge did not amount to an awareness that the County's easement claim was adverse to Butterfield's title. With respect to the tract map, Butterfield notes that the map indicated the easement was *outside* the boundary of Butterfield's property. However, Richard Macsyczek, a planning consultant retained by Pearson in December 1990, testified that at a January 10, 1991, meeting Tennant stated that the plans for tract No. 10429 had been superseded by the plans for AD-159. Lushing confirmed that he knew the property was being sold subject to the AD-159 plans and that those plans clearly showed the slopes encroaching onto Butterfield's property by almost 80 feet.

Additionally, Tennant in his letter and at the January 1991 meeting specifically referred to the County's easement as a "blanket easement" due to the fact that, at the time of the dedication, the final grade for Butterfield Stage Road was unknown. According to undisputed testimony, a blanket easement by definition is not precisely delineated by a legal description. There was also undisputed testimony that slope easements are always located *outside of* and next to roadway rights-of-way. Tennant's reference to a blanket easement therefore necessarily indicated that the actual extent of the easement could not be determined until the slopes were built. The court

[4]Pearson did not testify at trial, but his deposition testimony, in which he made the statements described above, was received pursuant to stipulation.

reasonably could infer that experienced real estate professionals such as the Butterfield principals would be sufficiently familiar with such matters to be aware that, regardless of what the tract map indicated, there was at least a strong possibility the slopes as constructed would extend beyond the right-of-way, onto Butterfield's property.

In fact, Butterfield knew not later than early 1991 that it could not rely on the plans prepared in connection with the tract map. Lushing testified that, by about February of that year, Butterfield knew "that our property could not be developed in accordance with the plans approved for tract 10429 . . . ." Pearson told Lohr, Butterfield's engineer, that the roadway as built was 25 feet higher than the elevation shown on the street improvement plans prepared in connection with the tract map. Pearson also told Macsyczek, Butterfield's consultant, no later than March 1991 "that he understood he could not implement the improvement plans for tract number 10429," due to the increased elevation of Butterfield Stage Road. The extent of the slopes, and their encroachment onto Butterfield's property, necessarily depended on the final elevation of the roadway. Thus, Butterfield's awareness of the increase in elevation establishes its awareness that the actual slope easements would not be as depicted in the tract map.

With respect to the 1969 Grant Deed, Butterfield notes that, even if it knew of the deed, the document did not actually convey any easement to the County, but only *reserved* the right to convey such an easement, "which might or might not have been exercised." However, as stated, Tennant expressly asserted at the January 1991 meeting that the County's claim was based on the 1969 Grant Deed and the "Kaiser-Aetna slope easement," and his letter expressly referred to a dedication "made by" Kaiser Aetna. These statements provided ample notice to Butterfield that the easement right reserved in the 1969 Grant Deed had, in fact, been exercised in the 1973 Certificate of Dedication recorded by Kaiser Aetna.

The record thus demonstrates that, more than three years before it made its claim on the policy, Butterfield was aware that (1) the County claimed a slope easement based on the 1969 Grant Deed and the Kaiser Aetna dedication; (2) the County's claim, if valid, was adverse to Butterfield's title and would prevent development of the property as planned; (3) the documents of record, which Pearson had researched, included the 1969 Grant Deed, 1973 Certificate of Dedication, and 1989 Resolution of Acceptance; and (4) none of those documents was excepted from coverage either in the purchase agreement or in the preliminary report and commitment to furnish a policy. Accordingly, each of the elements Butterfield contends were required for accrual—awareness of an adverse claim of *title*, founded

on *matters of record, other than* those *expressly excepted* in the title policy—was present.

### f. *Adverse Court Determination*

Butterfield finally argues its cause of action could not accrue until its claim against the County was resolved adversely to Butterfield's title.[5] Butterfield relies on paragraph 8(b) of the title policy, which stated, under the heading "LIMITATION OF LIABILITY": "In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction and disposition of all appeals therefrom, adverse to the title, or if applicable, to the lien of the insured mortgage, as insured."

We do not read this language as Butterfield does. As previously noted, section 339(1) provides that the statute of limitations on a claim under a title policy runs from "the discovery of the loss or damage suffered by the aggrieved party thereunder." Paragraph 8(b) of the Chicago policy does not purport to specify when "loss or damage" occurs. Rather, by its terms, that provision merely states that, in the event of litigation, Chicago shall have no "*liability*" for loss or damage until there has been a final determination by a court. (Italics added.)

Thus, paragraph 8(b) *assumes* loss or damage has occurred and merely specifies the point at which the company becomes obligated to indemnify the insured for that loss or damage. Quite logically, where a matter is litigated, the extent of an insurer's *liability* cannot be determined until there is a final judgment. However, that does not mean no *loss or damage* has yet occurred. The possible existence of an easement constitutes a cloud on title which results in immediate damage, even absent formal enforcement of the claim to the easement. (See *Herbert A. Crocker & Co.* v. *Transamerica Title Ins. Co.* (1994) 27 Cal.App.4th 1722, 1729 [33 Cal.Rptr.2d 313].) Thus, in the event of litigation the insured necessarily will have discovered the loss or damage long before a final judgment is rendered, and under the express language of section 339(1) the limitations period already will have commenced to run.[6]

*Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289 [98 Cal.Rptr. 547], on which Butterfield relies, is inapposite. *Moe* did not

[5]Butterfield presents this argument as a subsection of the part of its brief devoted to tolling. However, it appears the actual argument is not that the statute was *tolled* pending the court's determination of the easement claim but that Butterfield's cause of action did not *accrue* until the adverse determination was made.

[6]Because we do not find the language of paragraph 8(b) to be ambiguous, the principle that ambiguity in an insurance policy is resolved against the insurer, on which Butterfield seeks to

involve the issue of accrual of a cause of action for statute of limitations purposes. Rather, the insurer claimed the insureds breached a provision of the policy which required, in the words of the court, that the insureds "give written notice within 60 days after the loss or damage was *determined*." (Italics added.) The court stated that, until the property was sold by order of court free and clear of the insureds' trust deed, their loss or damage was not "determined." (*Id.*, at p. 301.)[7]

The result in *Moe* thus turned on the policy language to the effect that the period for giving notice ran from the time the loss or damage was "determined." In view of that language, it was reasonable to hold that the claim against the insureds' title must actually be "determined" by the court before requiring that notice must be given. But there is no comparable requirement that an insured's loss or damage be "determined" by a court before the statute of limitations starts to run. Rather, as discussed *ante*, the statute commences when the insured "discovers the *potential* loss" which " '*may* be incurred if the title is not as represented' " in the policy. (*Tabachnick* v. *Ticor Title Ins. Co.*, *supra*, 24 Cal.App.4th 70, 77, italics added.)

*Orange County Foundation* v. *Irvine Co.* (1983) 139 Cal.App.3d 195 [188 Cal.Rptr. 552], on which Butterfield also relies, is also distinguishable. There, the policy expressly made coverage dependent on a *final judgment* declaring that the disputed properties were tidelands belonging to the state. (*Id.*, at p. 199.) Accordingly, the court concluded, "[t]here could not be any loss or damage recoverable against [the insurer] on the policy unless a court first found the UNB islands were tidelands. Thus, it is only when such a determination is made the statute of limitations begins to run." (*Id.*, at p. 202.)

Here, in contrast, the policy did not specify there could be no recoverable loss or damage absent a court determination of the status of the property. Instead, as stated, it merely provided that, *if* there was litigation, Chicago would not become *liable* for such loss or damage until the matter was concluded.

Finally, we note that, if Butterfield's interpretation of paragraph 8(b) were correct, accrual of a cause of action on a title policy would become fraught

---

rely, does not apply. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 667 [42 Cal.Rptr.2d 324, 913 P.2d 878].)

[7]The court in *Moe* also held the insurer had failed to prove it was prejudiced by the insureds' delay in giving notice which, as discussed *post*, is a requirement when an insurer seeks to avoid liability based on breach of a notice provision, but not where it relies on the statute of limitations. (21 Cal.App.3d at p. 302.) In fact, the court held the failure to show prejudice was "[t]he most glaring weakness" in the insurer's position. (*Ibid.*) Thus, the court's conclusion that the loss or damage was not "determined" until the court-ordered sale of the property might be viewed as dictum.

with uncertainty. As Butterfield acknowledged at oral argument, even under its interpretation paragraph 8(b) only delays the accrual of the cause of action if the title dispute is litigated in court. If the dispute is not litigated, the cause of action accrues immediately on discovery of the loss or damage.

The problem with this interpretation is that it not possible to determine in advance whether a title dispute will be litigated. Thus, when the dispute develops and the insured learns of the potential loss, there is no way to know whether the cause of action on the policy has accrued immediately or will not accrue until litigation is filed and concluded at some future point, even if that should occur years after the two-year period running from discovery has expired. If litigation is filed, even a cause of action already expired would be resuscitated. Such a state of affairs would be patently unworkable and would defeat the entire purpose of the statute of limitations—freedom from exposure to potential litigation after a reasonable time has elapsed.

### 2. Tolling

██ Butterfield argues in the alternative that, even if its cause of action accrued in October 1990 as the court determined, the statute of limitations was tolled on account of various factors.

#### a. Investigation of Claim

First, Butterfield argues that the statute of limitations on a claim under a title policy is equitably tolled while the insurer is investigating the claim. (See *Forman* v. *Chicago Title Ins. Co.* (1995) 32 Cal.App.4th 998, 1001 [38 Cal.Rptr.2d 790].) Chicago investigated Butterfield's claim for several months after it was tendered in September 1993 before denying the claim. But, as Butterfield acknowledges, "[t]olling can only suspend the running of a statute that still has time to run; it cannot revive a statute which has already run out." (*Id.*, at p. 1006.) We have previously determined the statute began to run no later than early 1991. Consequently, the statute had expired by the time Butterfield tendered its claim, and any tolling during the ensuing investigation is immaterial.

#### b. Equitable Tolling

Butterfield next invokes the principle that a statute of limitations will be equitably tolled where a plaintiff who has several legal remedies "reasonably and in good faith[] pursues one designed to lessen the extent of his injuries or damage." (*Addison* v. *State of California* (1978) 21 Cal.3d 313, 317 [146 Cal.Rptr. 224, 578 P.2d 941].) Butterfield contends the statute was equitably

tolled in this case while it attempted to negotiate a resolution of its dispute with the County. However, in each of the decisions on which Butterfield relies, the plaintiff took formal legal action in pursuit of its alternative remedy, either against the defendant or against a third party. (See *Addison* v. *State of California*, *supra*, at p. 315 [statute of limitations on plaintiff's state court action tolled during pendency of plaintiff's federal court action against same defendants]; *Elkins* v. *Derby* (1974) 12 Cal.3d 410, 413 [115 Cal.Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839] [statute of limitations on plaintiff's tort cause of action tolled during pendency of plaintiff's workers' compensation proceeding against same defendants]; *Stalberg* v. *Western Title Ins. Co.* (1994) 27 Cal.App.4th 925, 932-933 [32 Cal.Rptr.2d 750] [statute of limitations on plaintiffs' slander of title claims against defendant tolled during pendency of plaintiffs' quiet title action against third parties seeking to remove cloud created by defendant's improper easement].) Butterfield cites no authority holding that merely engaging in informal negotiations equitably tolls the statute.

Additionally, equitable tolling only applies where the defendant receives notice, *within* the limitations period, of the plaintiff's pursuit of the alternative remedy, so that the defendant is aware of the need to begin investigating the matter. (*Structural Steel Fabricators, Inc.* v. *City of Orange* (1995) 40 Cal.App.4th 459, 465 [46 Cal.Rptr.2d 867]; *Barr* v. *ACandS, Inc.* (1997) 57 Cal.App.4th 1038, 1059 [67 Cal.Rptr.2d 494]; *Kolani* v. *Gluska* (1998) 64 Cal.App.4th 402, 408 [75 Cal.Rptr.2d 257].) There is no indication Butterfield notified Chicago of its attempts to resolve the easement dispute with the County at any time during the limitations period. Although Butterfield asserts it gave Chicago notice as soon as it knew the County's claim was based on the Omitted Documents (which, according to Butterfield, did not occur until May 1994), we have previously determined Butterfield had that knowledge no later than early 1991.

Butterfield argues Chicago cannot assert lack of notice unless it can show prejudice. This argument confuses the statute of limitations defense with a defense based on a policy provision requiring prompt notice of loss. In the latter situation, the insurer must show actual prejudice to rely on lack of notice to avoid liability. (See, e.g., *State Farm Fire & Casualty Co.* v. *Superior Court*, *supra*, 210 Cal.App.3d 604, 612; *Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 819 [26 Cal.Rptr.2d 391].) In contrast, "[t]he courts require no showing of prejudice to enforce a statute of limitations, in insurance cases or otherwise." (*State Farm*, *supra*, at p. 612.)

c. *Delivery of Policy*

Butterfield's remaining contention is that the statute was tolled until Chicago delivered to Butterfield a copy of the title policy, in April 1992.

Butterfield concedes it has no authority to support this argument. In addition, Lushing testified on two occasions during the trial that the lack of a copy of the policy was not the reason for Butterfield's delay in making a claim on the policy.[8]

B. *Attorney and Expert Fees**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

The judgment is affirmed. Costs to respondent.

Hollenhorst, Acting P. J., and Ward, J., concurred.

---

[8]Butterfield argues that, since Lushing was only a limited partner of Butterfield until May 1992, his admission that the lack of a copy of the policy did not cause *him* not to make a claim on the policy does not preclude *Butterfield* from arguing for tolling based on lack of a copy. However, Butterfield offers no evidence that lack of a copy of the policy caused Pearson, the general partner of Butterfield, not to make a timely claim.

*See footnote, *ante,* page 1047.