[No. A124730. First Dist., Div. One. Sept. 16, 2010.]

KAREN LEE et al., Plaintiffs and Appellants, v.
FIDELITY NATIONAL TITLE INSURANCE COMPANY, Defendant and
Respondent.

586

**COUNSEL**

Alborg, Veiluva & Martin, Thomas E. Alborg, Michael J. Veiluva and William S. Fiske for Plaintiffs and Appellants.

Hennelly & Grossfeld and Susan J. Williams for Defendant and Respondent.

**OPINION**

**MARCHIANO, P. J.**—This case concerns coverage under a title insurance policy issued by defendant Fidelity National Title Insurance Company to plaintiffs Karen and Terry Lee. Plaintiffs purchased property along Steamboat Slough in Solano County that was identified by two tax assessor parcel numbers. Defendant issued a preliminary report that referred repeatedly to both assessor parcels, and included a legal description of the property to be insured. The legal description, which matched the one in plaintiffs' grant deed, was incorporated into the title insurance policy. Parcel number references were not incorporated into the terms of the policy, but the policy attached a map depicting the two parcels, which could have caused plaintiffs to believe they had purchased and insured both parcels. This expectation of coverage would not have been dispelled by a reading of the metes and bounds legal description, which required professional training to decipher and was ambiguous to a layperson. When plaintiffs later discovered they did not, in fact, own one of the assessor parcels and made a claim under the policy, defendant stood behind the legal description in the policy and denied coverage. The trial court granted summary judgment to defendant on plaintiffs' breach of contract and related claims.

This court addressed a similar situation 50 years ago in *Lagomarsino v. San Jose etc. Title Ins. Co.* (1960) 178 Cal.App.2d 455, 465 [3 Cal.Rptr. 80], when a title insurer attempted to avoid liability based on an ambiguous legal description of the property covered by the policy, and we concluded that "[t]he ambiguity should be resolved in favor of the insured." We observed that "[t]he function of the title company is to 'give the insured the protection which he reasonably had a right to expect' [citation] . . ." (*id.* at p. 464), and reasoned that " '[t]he risk of a proper description was assumed by the company, and it should bear the responsibility for the mistake' " (*id.* at p. 465).

We reach the same conclusion for the same reasons here, and reverse the summary judgment for defendant.

## I. BACKGROUND

Plaintiffs own a parcel of land on Ryer Island in Walnut Grove identified as Solano County Assessor's Parcel Number (APN) 042-230-090 (hereafter APN 9), which, according to a letter and map prepared in 2007 by a surveyor they hired, is bordered on the east by a slough, and on the south by land owned by Raymond and Joann Walker. Plaintiffs acquired APN 9 in 1990; the legal description of the property in their grant deed is set forth below.[1]

When plaintiffs bought APN 9 in 1990, they thought they had also purchased APN 042-230-220 (APN 22). The sellers' agent told plaintiffs' agent, John Perez, that the property for sale was APN 9 and APN 22, and the purchase contract identified the property at different points as "APN 42-23-9, 22," and "APN 42 23 9-22."

Plaintiffs obtained a July 2, 1990, preliminary report from defendant stating that defendant was "prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth . . . ." The report identified the "Property Address" as "APN: 42-230-09 & 42-230-22," and included a page setting forth the legal description in footnote 1, *ante.* Unpaid taxes on APN's 9 and 22 were listed among the exceptions to coverage, and typewritten notes after the list of exceptions included additional tax information for both APN's. The report also included a Solano County Assessor's map of the area with arrows pointing to APN's 9 and 22. A disclaimer stamped onto the map stated: "This is a Diagram for Location purposes only. And it is not a part of the policy or report to which it is attached."

The preliminary report listed an address for defendant in Fairfield and bore the escrow No. 81694; Perez prepared a notice to defendant dated July 11,

---

[1] "All that real property situated in an Unincorporated Area, County of Solano, State of California, described as follows:

"That certain tract of land, located in Survey No. 185, Swamp and Overflowed Lands, Solano County, designated 'Peter Ostman 23-11A', on the Map of Reclamation District No. 501, filed for record on October 2, 1911 in Book 4 of Maps, page 2, Solano County Records, described as follows:

"Beginning at the Northwest corner of said tract of land, being the Northwest corner of Survey No. 185 as shown on said map, the said survey as to designated on said map is identical with and is the same as surveyed and monumented by E.N. Eager, licensed surveyor, in 1894, which last mentioned survey is shown on Map of Ryer Island, which was filed for record on June 13, 1895 in Book 1 of Maps, page 104; thence from said point of beginning, South 13' 15' West, along the West line of said Survey No. 185, a distance of 20.03 chains; thence East 11.70 chains, more or less, to the West bank of Steamboat Slough; thence Northerly along the West bank of Steamboat Slough and Sutter Slough, to the Northeast corner of said tract of land designated 'Peter Ostman', which is located South 89' 15' East from the point of beginning, thence North 89' 15' West 10.70 chains, more or less, to the point of beginning."

1990, asking that a new escrow be opened for the sale, identifying the property address as "APN 42-23-9 & 22," and indicating that payment for title insurance would be split between the buyer and seller. Defendant could not locate the file for the escrow, but Perez kept some of the escrow records. A document on letterhead of "Fidelity National Title Insurance Company," i.e., defendant, dated September 10, 1990, for escrow No. 901910, entitled "Buyer's Escrow Instructions (Continued) . . . Estimated Closing Statement," listed a charge to be split between buyer and seller for an "Owner's Title Policy" for the property.

The grant deed to plaintiffs was recorded on September 25, 1990. The deed stated that a transfer tax had been paid for "Tax Parcel No. 42-230-09 & 22," and used the legal description quoted in footnote 1, *ante*, to describe the property conveyed. A September 25, 1990, escrow statement to plaintiffs on letterhead of "Fidelity National Title" in Sacramento for escrow No. 901910 identified the address of the property conveyed as "42-230-09 AND 22, CA" and showed that they were charged $326 for their half of the cost of the title policy.

Plaintiffs cannot recall whether they received a copy of the title insurance policy; such policies are generally delivered after the close of escrow. Defendant converted its record of plaintiffs' policy into an electronic format, and the record was stored on computer by defendant's affiliate, Fidelity National Title Group Record Centers (FNTGRC). Defendant retained only those policy terms that were unique to the individual transaction because the other policy terms could be ascertained from the record of standard polices approved at particular times by the Department of Insurance. Personnel of FNTG Sacramento Title Group, another affiliate of defendant, retrieved copies of plaintiffs' title policy from FNTGRC in 2006 and 2007.

In support of the motion for summary judgment, defendant filed a copy of a sample title policy jacket from Chicago Title Insurance Company (Chicago Title), a "sister or related" company of defendant, with the terms of the 1988 form California Land Title Association standard coverage policy that would have been issued to plaintiffs. Defendant also lodged the pages of the policy that were specific to plaintiffs' transaction, which consisted of (1) a schedule A, with basic information about the policy such as the date, the file number (81694, the original Fairfield escrow number), and the amount of liability; (2) a schedule B, listing exceptions from coverage; (3) an exhibit A with the legal description of the property quoted in footnote 1, *ante*; and (4) the assessor's map that was included in the preliminary report with arrows each pointing to APN's 9 and 22, and the disclaimer that the map was not a part of the policy, but was for location purposes. Apart from the map, the policy made no reference to APN 9 or 22. The land covered by the policy was identified by the legal description in exhibit A.

The Walkers bought their property, identified as APN 42-230-210 (APN 21) and located to the south of plaintiffs' property, in 1992. Plaintiffs were unsure of the exact location of APN 22, but they believed, based on discussions with Perez and the local building department around the time they bought their land, that APN 22 extended south for some distance beyond their border with the Walkers, in between the Walkers' property and the slough to the east. Plaintiffs thought, in other words, that the Walkers' parcel APN 21 was at least partially landlocked.

Plaintiffs received a November 1992 notice from the United States Army Corps of Engineers that the Walkers intended to construct a boat dock in the slough, and the Walkers placed pilings in the slough near the southern border of their property in 1993. Plaintiffs assumed that the United States Army Corps of Engineers "would not allow [the Walkers] to build on anything that was our property," and thus that the Walkers must have owned the land bordering the slough at the southernmost tip of their property.

From the time they acquired their property until 2006, plaintiffs paid property taxes on APN 22, as well as APN 9; from at least 1999 on, they were assessed fees on both APN's by Reclamation District 501 for maintenance of levees along the slough. In connection with refinancing of their property, plaintiffs conveyed title in 2002 from themselves as trustees of a family trust to themselves as joint tenants, and then back again in 2005 to themselves as trustees. The legal descriptions of the property in these grant deeds included references to APN's 9 and 22 after the language in footnote 1, *ante*. This same legal description, with the references to both APN's, appeared in a 2002 preliminary report issued by Chicago Title in connection with the refinancing.

Plaintiffs did not think it was necessary to investigate the precise location of APN 22 until they decided to sell their property in 2006. Plaintiffs told their real estate agent, Kate Bould, when they listed the property that they owned APN 9 and APN 22, and Bould obtained a June 2, 2006, preliminary report from Chicago Title that appeared to confirm plaintiffs' belief. The report stated that plaintiffs owned the land referred to in "Exhibit 'A,' " which included a reference to "APN: 042-230-090, 042-230-022," as well as the legal description in footnote 1, *ante*.

Plaintiffs took the title policy map with the arrows pointing to APN's 9 and 22 to the Solano County Assessor (the Assessor), and discovered that the Walkers' pilings encroached on APN 22. Plaintiffs hired Attorney Franklin Watson, who sent a letter to Mr. Walker on August 16, 2006, asserting that plaintiffs owned APN 22 and, based on plat maps obtained from the Assessor, that APN 22 ran along the edge of the slough for the entire length of the

Walkers' property. As a result, Watson told Walker, "your Lot 21 has no water frontage," and the pilings placed in the slough were trespassing on plaintiffs' land.

On October 16, 2006, Watson faxed defendant a letter saying he had learned that the Assessor had changed its records with respect to APN 22, and now showed the Walkers, rather than plaintiffs, as the owners. Watson stated that plaintiffs had purchased APN 22 in 1990 and obtained title insurance from defendant for the purchase, and demanded that defendant "obtain clear title in favor of my clients."

On October 23, 2006, the Assessor sent a letter to plaintiffs and the Walkers advising that taxes on APN 22 had been erroneously assessed to plaintiffs, and would thereafter be assessed to the Walkers. The Assessor stated that the error dated back to 1978, when title to plaintiffs' land was conveyed to plaintiffs' sellers. Going back through the chain of title, the Assessor concluded that title to APN 22 had been held by the Walkers' sellers, not plaintiffs' sellers, and was conveyed to the Walkers when they bought their property. According to plaintiffs' surveyor's map, the Assessor determined that APN 22 was situated within the Walkers' parcel along its eastern border with the slough.[2]

John Keating, Jr., a consultant on title and title insurance matters, was retained by defendant to investigate plaintiffs' claim under their title policy as to APN 22. Keating examined the deeds to plaintiffs' and the Walkers' properties, determined that the legal descriptions did not overlap, and concluded that each parcel was bordered on the east by the slough. Keating further concluded, consistent with the map prepared by plaintiffs' surveyor, Ty Hawkins, based on information Hawkins received from the Assessor, that APN 22 was entirely within the Walkers' property, and stretched along the length of its border with the slough.

Janice Vinci, an attorney for defendant who handled plaintiffs' claim under the policy, sent Watson a letter dated April 12, 2007, denying coverage of plaintiffs' dispute with the Walkers over ownership of APN 22. Vinci had asked Keating to confirm her analysis, but contrary to the conclusion Keating says he reached—that APN 22 was entirely within the Walkers' parcel— Vinci's April 12 letter stated that plaintiffs' property included part of APN 22, but only that portion of APN 22 that was within "the Northern and Southern borders of Parcel 09," and not "any portion of the Walkers' ownership of Parcel 21 and Parcel 22 south of [plaintiffs'] property line." The letter

---

[2] Ms. Lee testified in her deposition that the reclamation district disagrees with the Assessor over responsibility for APN 22, and continues to charge plaintiffs the maintenance fees for APN 22.

advised, in any event, that plaintiffs held title "to the legal description as set forth in their Grant Deed and are insured to hold title to *no more than* that which is described in their Grant Deed and Schedule A of their Title Policy."

Keating acknowledged in his deposition that brokers commonly open escrows and title orders with just a street address or assessor's parcel number. Keating was asked, "And as part of the search and examination process before issuing the title insurance policy at close of escrow, it would be typical for the title company to confirm that the legal description matched the assessor parcel number, correct?" He answered, "That would be the ideal situation, yes." Similarly, Vinci acknowledged in her deposition that when a preliminary report is requested for properties identified only by assessor's parcel numbers, the title company is responsible for creating a report with a legal description that is consistent with those numbers.

J. Michael Cochran, an attorney and claims manager for defendant, testified in his deposition that in reviewing a claim under a policy defendant is required to look to the reasonable expectations of the insured. Vinci's deposition included the following colloquy: "Q. In connection with your final determination, did you take into consideration the reasonable expectation of the insureds? [¶] A. I took into consideration the terms and coverage of the policy of title insurance as represented in that document and coupled with the legal description of the property that was conveyed to the grantees. . . . [¶] Q. My question is—I understand your answer. My question is: In addition to that, did you take into consideration the reasonable expectation of the insureds? [¶] A. No. . . . [¶] Q. So you didn't give any thought to whether or not they may have thought they were getting title to APN Parcel 22 and 9 in the legal description because they didn't know how to read one? [¶] [A.] I did not take into consideration what they thought. I took into consideration what was conveyed and what was insured under the title policy."

Vinci conceded in her deposition that a policy of title insurance should be consistent with the preliminary report except for changes specified in the escrow instructions. In his declaration in support of the summary judgment motion, Cochran stated that defendant was not authorized to, and did not, provide escrow services in California in 1990. He said that escrow services provided to those receiving defendant's title policies at that time were typically performed by defendant's affiliated company, Fidelity National Title Company. Perez testified in his deposition that he understood, consistent with his experience with other escrows, that defendant had acted as both escrow agent and title insurer for plaintiffs' purchase.

Real estate agent Bould testified in her deposition that plaintiffs' property was shown 16 times during the seven months in which it was listed for sale,

and that three prospective buyers visited the property on more than one occasion. She said that the listing was not extended because of the "smudge" on plaintiffs' title to APN 22. She never tried to market APN 9 by itself because she thought that APN 9 did not have waterfront access without APN 22, an understanding she conveyed to potential purchasers. When asked whether she "could easily remarket" APN 9 if it had waterfront access apart from any dispute over APN 22, Bould said, "If that was correct, yes."

New counsel, retained by plaintiffs after receiving Vinci's April 12, 2007, letter declining coverage, exchanged further correspondence with Vinci before filing suit against defendant on August 3, 2007. The first amended complaint alleged causes of action for declaratory relief, breach of insurance contract, bad faith breach of insurance contract, and escrow negligence.

The court granted defendant's motion for summary judgment, finding on the basis of schedule A and exhibit A in the title policy that the policy "provided coverage for Parcel 9 only; it did not provide coverage for Parcel 22." Plaintiffs' claims for breach of contract, bad faith, and declaratory relief were therefore untenable. The court found that the breach of contract and escrow negligence causes of action accrued in 1993, when plaintiffs "became aware that Walker was building a dock on the land known as Parcel 22 without their permission." Accordingly, the court concluded that those causes of action were time-barred.

## II. DISCUSSION

### A. *Preliminary Matters*

Plaintiffs have erroneously appealed from the order granting summary judgment. (*Kasparian v. AvalonBay Communities, Inc.* (2007) 156 Cal.App.4th 11, 14, fn. 1 [66 Cal.Rptr.3d 885] [appeal lies from the judgment, not from the order granting a motion for summary judgment].) We have augmented the record to include a copy of the judgment against plaintiffs filed on April 7, 2009, and we construe the appeal to be from that judgment. (*Ibid.*)

Plaintiffs filed a motion for summary adjudication of the issue of duty, which was denied as moot in the order granting defendant's summary judgment motion. In their appellate briefs, plaintiffs ask us "to reverse the trial court's ruling granting summary judgment to [defendant]," and do not argue that they are entitled to summary adjudication of any issue. Accordingly, our review will be confined to the issue of defendant's entitlement to summary judgment.

B. *Scope of Review*

"The rules of review are well established. If no triable issue as to any material fact exists, the defendant is entitled to a judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo. [Citations.]" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499 [64 Cal.Rptr.3d 803, 165 P.3d 581].)

C. *Coverage*

At the hearing on the summary judgment motion, the trial court summed up its thinking as follows: "[P]laintiffs cannot recover for a breach of title insurance policy as to land they never purchased, never owned and never insured." Similarly, defendant asserts that "[t]he issue here is whether [plaintiffs] can seek to hold [defendant] liable for breach of policy obligations based on a preliminary report that offered to insure property that [plaintiffs] did not purchase, own or insure." As plaintiffs point out, their ownership of the disputed parcel, APN 22, has no bearing on whether the title policy covered that parcel. If the policy covers the parcel, and if, as the evidence shows, the Walkers and not plaintiffs own APN 22,[3] then defendant is obligated under the terms of the policy to indemnify plaintiffs for any loss they have suffered because "[t]itle to the estate or interest [is] vested other than [in plaintiffs]."[4]

■ Defendant's formulation of the coverage issue appears to acknowledge that the preliminary report "offered" to insure APN 22. Such a concession would be consistent with Insurance Code section 12340.11,[5] which states that while a preliminary report "shall not be construed as, nor constitute, a representation as to the condition of title to real property," it "shall constitute a statement of the terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted." Even if the point is not conceded, the preliminary report in this case can be reasonably construed as

---

[3] Plaintiffs submit that defendant presented no admissible evidence as to the boundaries of their land because "[d]eciphering a metes and bounds description and determining the boundary lines of the property described therein is a function that *only* a licensed land surveyor is qualified to perform under California law." However, defendant lodged a map prepared by the licensed surveyor plaintiffs hired, which showed the boundaries of plaintiffs' and the Walkers' parcels and situated APN 22 within the Walkers' property.

[4] Plaintiffs contend that even if summary judgment was properly granted on their claim under this insurance of title, they have a valid claim under the policy provision that insures against "[u]nmarketability of the title." We need not reach the marketability argument in view of our conclusion that plaintiffs have a viable breach of contract cause of action based on their defective title.

[5] Unless otherwise indicated, subsequent statutory references are to the Insurance Code.

an offer to insure APN 22. The report included APN 22 in the property's address, listed exclusions from coverage that were specific to APN 22, and attached an assessor's parcel map with an arrow pointing to the number 22. Plaintiffs could have reasonably expected, under the circumstances, that they were buying a title insurance policy on APN 22 that would conform to the preliminary report.

■ That reasonable expectation informs interpretation of the policy's coverage. As our Supreme Court stated in *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309] (*White*), " 'In determining what benefits or duties an insurer owes his insured pursuant to a contract of title insurance, the court may not look to the words of the policy alone, but must also consider the reasonable expectations of the public and the insured as to the type of service which the insurance entity holds itself out as ready to offer. [Citation.] Stated in another fashion, the provisions of the policy, " '*must be construed so as to give the insured the protection which he reasonably had a right to expect, . . .*' " (Original italics.) [Citation.]' " The *White* court rejected the insurer's argument that the plaintiffs in that case could not be deemed to have relied upon the title policies in question when they purchased their lands because the policies "were issued only when the sale was consummated." (*Id.* at p. 882, fn. 6.) The court noted that the plaintiffs "did rely on the preliminary title report. If, as defendant contends . . . that report is an offer to insure upon the terms stated, plaintiffs' reliance on that report is equivalent to reliance upon the policies issued in conformity with the report." (*Ibid.*)

Defendant argues that *White* is no longer good law because the preliminary report in that case was furnished before the effective date of section 12340.11, which we have quoted above. As explained in *Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1190–1191 [54 Cal.Rptr.2d 84] (*Siegel*), section 12340.11 was enacted to distinguish the duties of a title insurer from those of an abstractor of title, who provides "a written representation . . . intended to be relied upon by the person who has contracted for the receipt of such representation, listing all recorded conveyances, instruments or documents which, under the laws of this state, impart constructive notice with respect to the chain of title to the real property described therein. . . ." (§ 12340.10.) Section 12340.11 made clear that " '[a] preliminary report, for which little or no charge is made, is merely the inducement to purchase a title policy. It will no longer be treated or considered to have the legal consequence of an abstract of title. If a current representation as to the status of title is required then an abstract can be ordered and separately purchased.' " (*Siegel, supra,* 46 Cal.App.4th at p. 1192; see also Cal. Title Insurance Practice (Cont.Ed.Bar 2d ed. 2009) § 5.25, p. 112 [noting that "preparation of an abstract can take months and be very costly"].)

■ *Siegel, supra,* 46 Cal.App.4th at pages 1192–1193, continued: " 'The title insurer intends by the issuance of a preliminary report to provide only a representation that a policy of title insurance will subsequently be issued insuring the title in the condition described in the preliminary report. The prospective insured *reasonably* concludes a transaction in reliance not on the preliminary report, but on the anticipated policy of title insurance. . . . The issuer of a preliminary report merely intends to induce the prospective insured to purchase a policy of title insurance and to declare in advance of such purchase precisely the risk which it will agree to assume.' . . . [¶] . . . '. . . [T]he preliminary report is now deemed nothing more than an offer to issue a title policy. . . . For this reason an action for negligence will no longer lie against a title insurance company on the basis of its representations in the preliminary report[.]' . . . [¶] In short, a title insurer prepares a preliminary report to limit its own risk—by locating and excluding items from coverage—and not on behalf of any party to a real estate transaction. A party who does not purchase title insurance may not rely on the title insurer to protect his or her interests or to disclose all detrimental information contained in the recorded files. Parties who desire protection against the possibility that negative information exists that was not revealed in the title insurer's search of the records must obtain title insurance. . . ." (Citations & fn. omitted.)

Section 12340.11 has therefore established that a title insurer cannot be held liable for negligence in connection with a preliminary report, and that the recipient of the report cannot rely on it to represent the status of title to the property to be insured. (See *Soifer v. Chicago Title Co.* (2010) 187 Cal.App.4th 365, 374 [114 Cal.Rptr.3d 1] [only an abstract of title or a policy of title insurance can provide "title information upon which reliance may be placed"].) The *White* case has been legislatively abrogated insofar as it affirmed a judgment holding a title insurer liable for negligent failure to list a recorded easement in a preliminary report. But *White*'s discussion of the insured's breach of contract cause of action, which we have quoted above, and which includes the directive to construe title insurance coverage consistent with the insured's reasonable expectations, remains good law.

*White* also remains good law insofar as it indicates that the insured can rely on a preliminary report to reflect the scope of the coverage being offered. Defendant quotes the statement in *2,002 Ranch v. Superior Court* (2003) 113 Cal.App.4th 1377, 1382, footnote 2 [7 Cal.Rptr.3d 197] (*2,002 Ranch*), disapproved on another point in *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 739–740 [101 Cal.Rptr.3d 758, 219 P.3d 736], that preliminary reports "are merely reports on the status of title and are not themselves insurance policies that could provide the basis for a cause of action against a title company," but that statement is too broad to the extent it could be taken to imply that reliance on such reports is never justified for any

purpose.[6] The preliminary report is an offer identifying ". . . 'precisely the risk which [the insurer] will agree to assume' " (*Siegel, supra*, 46 Cal.App.4th at p. 1193), which the insured accepts by buying the title policy, and the insured has the right to expect that the contract thus formed will be consistent with the terms of the offer. (See *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 790 [4 Cal.Rptr.3d 179] ["[t]he insured's approval and acceptance of the conditions set forth in the preliminary report create a binding contract based on the terms set forth in the report and any materials that are incorporated therein by reference"].) The buyer generally sees only the preliminary report before closing and would necessarily expect that the subsequently delivered policy of title insurance would conform to the preliminary report absent contrary escrow instructions. The title insurance policy in this case included the same map with the arrows pointing to the location of APN's 9 and 22 that was in the preliminary report.

■ We recognize the principle that an insured's ". . . 'objectively reasonable expectations' may be considered *to resolve* an ambiguous policy provision . . . but cannot be relied upon to *create* an ambiguity where none exists." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 4:210, p. 4-33 (rev. # 1, 2009), citation omitted.) In *Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654 [68 Cal.Rptr.2d 487] (*Havstad*), for example, the insureds claimed that their title policy protected their right to an easement over land, identified as "not a public street," outside their property. The land covered by the policy was described in schedule A as numbered lots 1 and 23 as shown on subdivision maps. (*Id.* at p. 659 & fn. 2.) The insureds argued that "the policy should be interpreted to include 'not a public street' even though it [was] clearly neither a part of nor appurtenant to either of the lots specifically referred to in the Schedule 'A' description." (*Id.* at p. 659.) The argument failed because it "ignore[d] the plain language of the insurance policy." (*Ibid.*) "An ordinary reading of the land's description indicates coverage for two pieces of property—lot 1 and lot 23," and "[a]ny expectation to the contrary on the part of the [insureds] would have been subjective and unreasonable. A party's subjective intent cannot be used to create an ambiguity or a material factual issue." (*Id.* at pp. 660, 661.)

■ While an "ordinary reading" of the legal description of the land insured in *Havstad* precluded any reasonable expectation of coverage in that case, the same cannot be said here. " '[T]he words in an insurance policy are

---

[6] The statement was, in any event, dictum because the *2,002 Ranch* opinion was addressing a discovery dispute in a case where the title insurer admitted liability. The breach of contract in that case consisted of the title policy's inclusion of exceptions to coverage that were not identified in the preliminary report. The facts of the case thus tend to negate any implication that no reliance can ever be placed on such reports.

to be interpreted according to the plain meaning which a layman, not an attorney or insurance expert, would ordinarily attach to the words . . .' . . ." (*Magna Enterprises, Inc. v. Fidelity National Title Ins. Co.* (2002) 104 Cal.App.4th 122, 125 [127 Cal.Rptr.2d 681]), and laypersons like plaintiffs would have no way of knowing from the surveyor's metes and bounds description of the land in their title policy whether APN 22 was covered. In the context of the coverage issue in this case, the legal description was ambiguous. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 4:300, p. 4-43 (rev. # 1, 2009) ["an ambiguity may arise where a policy uses terms beyond the working vocabulary of a person of ordinary intelligence . . ."].) Further ambiguity was created by the attachment of the assessor's parcel map that, on the one hand, was said to be excluded from the policy, but on the other hand had an arrow pointing to APN 22 as a parcel in the policy.

■ It bears emphasis that the legal description here is ambiguous only because of the circumstances under which the policy was issued, which involve a preliminary report that could be reasonably construed as an offer to insure property located outside the land described. We recognize that technical legal descriptions of real property have precise meanings to trained professionals that ordinarily can be relied upon, and are not suggesting that any description that is opaque to a layperson is necessarily ambiguous. Defendant likens this case to *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1393–1394, footnote 23 [89 Cal.Rptr.3d 659], where the plaintiffs, who were "illiterate in English," reasonably could have been expected "to get the help of a trusted person in reading and translating the documents seemingly essential to becoming a homeowner." But it cannot be seriously claimed that in the ordinary case a purchaser of title insurance is required to hire a surveyor to translate the technical legal description that describes the land the policy is expected to insure.

■ Defendant maintains that the title policy cannot be interpreted with reference to the preliminary report because the policy has an integration clause, and extrinsic evidence cannot change the terms of an integrated policy. (See *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 662–663 [75 Cal.Rptr.3d 812] [integrated policy could not be altered by insurer's agent's alleged oral representation].) However, extrinsic evidence is admissible to show that a policy is ambiguous. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 4:180, p. 4-28 (rev. # 1, 2009).) "In determining whether an ambiguity exists, a court should consider not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation. . . . Even language that may be plain and clear may be found to be ambiguous when read in the context of the policy and the circumstances of the case and, in order to give effect to the insured's objectively reasonable

expectations, construed in the insured's favor." (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246 [37 Cal.Rptr.3d 918], citation omitted.)

■ Defendant cites Revenue and Taxation Code section 11911.1 for the broad proposition that "where a conflict exists between an APN and a legal description, the legal description governs." This statute states: "Any ordinance which imposes the documentary transfer tax may require that each deed, instrument or writing by which lands, tenements, or other realty is sold, granted, assigned, transferred, or otherwise conveyed, shall have noted upon it the tax roll parcel number. The number will be used only for administrative and procedural purposes and will not be proof of title and in the event of any conflicts, the stated legal description noted upon the document shall govern. The validity of such a document shall not be affected by the fact that such parcel number is erroneous or omitted, and there shall be no liability attaching to any person for an error in such number or for omission of such number." This statute by its terms is confined to writings conveying real property. The statute does not apply in this case, which concerns a title insurance policy not a grant deed and the obligation to provide coverage for a title dispute.

■ For these reasons, defendant was not entitled to summary judgment on the causes of action for breach of contract, bad faith, or declaratory relief based on the evidence that APN 22 is located outside the land as legally described in the title policy.

Defendant argues that summary judgment on the bad faith cause of action can be affirmed on the alternative ground that defendant had a reasonable basis for denying plaintiffs' claim. (See *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1280–1281 [31 Cal.Rptr.2d 433] [reasonable, but mistaken, withholding of policy benefits does not expose insurer to bad faith liability]; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915] [reviewing court must consider whether summary judgment was warranted for reasons other than those given by the trial court].) However, "the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact . . ." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346 [108 Cal.Rptr.2d 776]), and we are not persuaded that this case is an exceptional instance when "only one reasonable inference can be drawn from the evidence" (*ibid.*).

## D. *Breach of Insurance Contract Statute of Limitations*

■ Actions on title insurance policies are subject to a two-year statute of limitations. (Code Civ. Proc., § 339, subd. 1.) The statute states that the

cause of action "shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder." (*Ibid.*) This language has been interpreted to " 'refer[] to discovery, not to the date when discovery would have been possible.' " (*Contini v. Western Title Ins. Co.* (1974) 40 Cal.App.3d 536, 548 [115 Cal.Rptr. 257]; but see *65 Butterfield v. Chicago Title Ins. Co.* (1999) 70 Cal.App.4th 1047, 1053–1054, fn. 1 [83 Cal.Rptr.2d 40] (*65 Butterfield*) [noting that an argument could be made for accrual of the cause of action when the facts essential to the claim should have been learned, but finding it unnecessary to address the argument under the facts of the case].) The cause of action does not accrue " 'until discovery of the loss that may be incurred if the title is not as represented . . .' . . ." in the policy. (*Tabachnick v. Ticor Title Ins. Co.* (1994) 24 Cal.App.4th 70, 77 [29 Cal.Rptr.2d 59].) Statutes of limitations issues are normally questions of fact, unless "the uncontradicted facts established through discovery are susceptible of only one legitimate inference . . . ." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923].)

The trial court found that the breach of contract cause of action accrued in 1993, when plaintiffs were aware that the Walkers were building a dock in the slough. However, contrary to the court's finding, the evidence did not establish that plaintiffs knew that the dock was on APN 22. (Cf. *65 Butterfield, supra,* 70 Cal.App.4th at pp. 1058–1059 [insured was aware that a claim adverse to its title had been asserted].) Plaintiffs testified that they did not know the precise location of APN 22, and assumed that the pilings the Walkers put into the slough were on the Walkers' property. There is no evidence that the Walkers claimed ownership of APN 22 until 2006, when plaintiffs investigated APN 22's location in order to sell their property. It is thus, at the very least, a triable issue of fact whether plaintiffs were aware of the loss stemming from the defect in their title to APN 22 before 2006, the year when they asserted their claim under their policy. This same conclusion would obtain even if a cause of action under a title insurance policy accrues when a plaintiff should have learned of his or her potential loss. Plaintiffs were assessed the property taxes on APN 22 until 2006, and as late as June 2, 2006, defendant's sister company Chicago Title was issuing preliminary reports showing that APN 22 was plaintiffs' property. Plaintiffs can reasonably assert that they had no reason to investigate the matter any sooner than they did.

Consequently, the court erred in granting summary judgment on the breach of contract cause of action based on the statute of limitations.

E. *Escrow Negligence*

The discussion in the preceding part has shown that the escrow negligence cause of action, which is premised on the assumption that the title policy does

not cover APN 22, was not time-barred as a matter of law, whether that cause of action is subject to the two-year statute of limitations for negligent performance of professional services (Code Civ. Proc., § 339, subd. 1; 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 650, p. 858) or the four-year statute of limitations for breach of contract (Code Civ. Proc., § 337, subd. 1).

Defendant contends that it nevertheless is entitled to summary judgment on that cause of action because it did not act as the escrow agent when plaintiffs purchased their property. Plaintiffs' response to this argument is that it "was not raised before the trial court and has been waived," but defendant raised the argument twice in its points and authorities below; plaintiffs are referred to pages 73 and 1878 of their appendix.

■ Defendant's evidence on the issue consists of claims manager Cochran's declaration that defendant was not authorized to perform, and did not perform, escrow services in California in 1990, and that when such services were rendered to recipients of its title policies at that time, they were "typically" provided by its affiliate, Fidelity National Title Company. The claim of lack of authority does not hold up, because the declaration admits that defendant is "engaged in the business of title insurance in the State of California within the meaning of Insurance Code section 12340.3," and the title insurance business is defined in section 12340.3, subdivision (c) to include "[t]he performance by a title insurer . . . of any service in conjunction with the issuance or contemplated issuance of a title policy including but not limited to the handling of any escrow . . . in connection therewith . . . ."

Cochran was not a percipient witness to what transpired in plaintiffs' escrow in 1990, and balanced against his representations that (1) defendant would not have handled the escrow, and (2) an affiliated company would typically have done so, are (1) plaintiffs' broker's understanding, based on his experience with plaintiffs' escrow and others, that defendant acted as both escrow agent and title insurer at the time, and (2) the presence of defendant's printed letterhead on an estimated closing statement for plaintiffs' escrow. Further questions are created by the references in the record to two escrows—one in Fairfield, and one in Sacramento—in connection with plaintiffs' purchase. Whether defendant acted as the escrow agent in plaintiffs' escrow is a triable issue of fact given the state of the evidence.

Therefore, the summary judgment on the escrow negligence count cannot be sustained on the alternative ground defendant offers.

### III. CONCLUSION

The judgment for defendant is reversed. Plaintiffs to recover costs.

Margulies, J., and Banke, J., concurred.

A petition for a rehearing was denied October 5, 2010, and respondent's petition for review by the Supreme Court was denied December 1, 2010, S187541.