<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 15a0311n.06

No. 14–5407

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 01, 2015
DEBORAH S. HUNT, Clerk

S&M HOMES, LLC,

    Plaintiff-Appellant,

        v.

CHICAGO TITLE INSURANCE COMPANY,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

**BEFORE: KETHLEDGE and WHITE, Circuit Judges; LUDINGTON, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge**. Plaintiff-Appellant S&M Homes, LLC ("S&M Homes"), brought a multi-count action against Defendant-Appellee Chicago Title Insurance Company ("Chicago Title") in state court, alleging that Chicago Title's fee structure associated with "title searches" in Shelby County, Tennessee, violates Tennessee law. S&M Homes sought to certify and represent a class of similarly situated individuals. Chicago Title removed the action to the district court and, after discovery, moved for summary judgment, arguing that its fee structure was fully disclosed to, approved by, and mandated by applicable state regulators. Chicago Title also objected to S&M Homes's proposed class certification.

The district court granted Chicago Title's motion for summary judgment, dismissed S&M Homes's motion to certify a class as moot, and, in the alternative, found that the putative class failed to meet the standards of Federal Rule of Civil Procedure 23. S&M Homes appeals, and we AFFIRM the district court's order granting Chicago Title's motion for summary judgment.

---

[*] The Honorable Thomas L. Ludington, United States District Court for the Eastern District of Michigan, sitting by designation.

**I.**

Chicago Title, an insurance company incorporated in Nebraska with its principal place of business in Florida, is an authorized title-insurance company in Tennessee. In August 2011, S&M Homes ordered a title search from Chicago Title on a property S&M Homes was selling in the City of Memphis, Shelby County, Tennessee. Chicago Title completed the title search, which involved compiling a large number of documents regarding the property's history of ownership, and invoiced S&M Homes $391.50 for a title-insurance policy as well as an additional $300 "title search" fee.

Alleging that the separate $300 fee violates Tennessee law, S&M Homes brought a three-count complaint against Chicago Title in the Chancery Court of Shelby County, Tennessee. S&M Homes sought to certify a class of similarly situated individuals; namely, "all persons and entities who paid a title search fee to [Chicago Title in Shelby County] since at least December 22, 2006." Based on the allegations in the complaint, Chicago Title removed the action to the District Court for the Western District of Tennessee pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A), which applies where the proposed class consists of at least 100 members and the remedy sought is over $5 million in damages.[1]

**II.**

**A.**

In reviewing the district court's grant of summary judgment we must construe all reasonable inferences in favor of S&M Homes. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

---

[1] This amount was not expressly stated in the complaint, but based on the allegations of "tens of thousands [of class members] for each year," and the $300 harm to each member, Chicago Title calculated that S&M Homes was seeking at least $15 million in compensatory damages alone.

prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). As the district court recognized, and both parties agree, S&M Homes's claim presents a pure legal issue: whether Chicago Title's August 2011 "title search" constitutes an "abstract of title" as that phrase is defined by the Tennessee insurance laws and regulations. The district court concluded that it does and we review that decision de novo. *Road Sprinklers Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793 (6th Cir. 2012).

**B.**

Rather than regulate each aspect of the title-insurance market directly, the Tennessee legislature authorized the Tennessee Commissioner of Insurance "to make reasonable rules and regulations as are or may be necessary for the administration of [the laws regulating title-insurance companies]." Tenn. Code Ann. § 56-35-122. To that end, the Commissioner has set forth certain rules and regulations for title-insurance companies, such as Chicago Title. Tenn. Comp. R. & Regs. 0780-01-12. In Tennessee, it is well settled that regulations promulgated pursuant to statutory authority have the force and effect of law. *Swift v. Campbell*, 159 S.W.3d 565, 571–72 (Tenn. 2004) (citing *Kogan v. Tenn. Bd. of Dentistry*, 2003 WL 23093863, at *5–6 (Tenn. Ct. App. Dec. 30, 2003)); *see also Furlough v. Spherion Atlantic Workforce, LLC*, 397 S.W.3d 114, 125–26 (Tenn. 2013).

To comply with Tennessee regulations, a title insurer is required to file and maintain a schedule of its services and rates with the Tennessee Commissioner of Insurance. Tenn. Code Ann. § 56-35-111(a). It must file the "risk rate" to be applied in counties with fewer than 275,000 residents. Tenn. Comp. R. & Regs. 0780-01-12-.02(1)(d). In counties with between 275,000 and 700,000 residents, the title insurer must file and charge an "all-inclusive rate," as defined below. Tenn. Comp. R. & Regs. 0780-01-12-.02(1)(a). In counties with more than

700,000 residents, such as Shelby County, the title insurer is required to file and charge "[a]n all inclusive rate, *except for charges for abstracts of title*," Tenn. Comp. R. & Regs. 0780-01-12-.02(1)(b) (emphasis added), and must file a rate schedule that includes the separate rate for preparing an abstract of title, *id.* at 0780-01-12-.02(2).

Under the regulations, and pertinent to all Tennessee counties with more than 275,000 residents, "all inclusive rate" is defined as:

> the aggregate consideration paid, or to be paid to a title insurance company, a title insurance agency, a title insurance agent, an approved attorney for a title insurance company, or any combination thereof in conjunction with the issuance of such company's commitment, binder or policy of title insurance for those functions embraced by the definition of "risk rate" in Tenn. Code Ann. § 56-35-102(a)(8), and for those matters such as abstracting, record search and the examination or determination of insurability in conjunction with the issuance of such commitment, binder or policy . . . and other matters related to assumption of a title insurance risk.

Tenn. Comp. R. & Regs. 0780-01-12-.01(2). Under this definition, the "all-inclusive rate" includes the "risk rate," as well as the fee for abstracting, record searching, and other matters related to examining the property's insurability.

After a rate schedule is filed, "[t]he commissioner shall within sixty (60) days after the receipt of any filing disapprove any rate the commissioner determines to be unfair, unjust or unfairly discriminatory." Tenn. Code Ann. § 56-35-111(d)(1). Once the rates are effective, the insurer must charge rates "in accordance with filings or rates that are in effect for the title insurance company as provided in [the approved rate schedule]," *id.* at § 56-35-111(b), and it is prohibited from making "any rate change except in accordance with the schedule of rates which is in effect for said title insurance company as provided in § 56-35-111," Tenn. Comp. R. &

Regs. 0780-01-12-.03. Chicago Title filed a rate schedule effective June 23, 2011, which was in force during the relevant transaction with S&M Homes.

## C.

In Shelby County (and other counties with more than 700,000 residents), Chicago Title must charge an all-inclusive fee, except that it may charge an additional fee for preparing an "abstract of title." Tenn. Comp. R. & Regs. 0780-01-12-.02(1)(b). An "abstract of title" is defined as "a history of title to real property or an interest therein for a given period of time consisting of a listing, summary, copy or some combination thereof of documents or matters affecting said title and imparting constructive notice under the laws." Tenn. Comp. R. & Regs. 0780-01-12-.01(3). It appears that the Commissioner anticipated variations in nomenclature regarding "abstracts of title":

> [E]very title insurance company which proposes to do business in any county in this state having a population of more than 700,000 . . . shall file with the Commissioner a schedule of rates for abstracts of title, *however denominated*, to be made in contemplation of the issuance of each and every commitment, binder or policy of title insurance to be issued by the company . . . whether such abstracts of title be made from a title plant or from the public records.

Tenn. Comp. R. & Regs. 0780-01-12-.02(2) (emphasis added). Thus, regardless of the name used, if Chicago Title produces a property's "history of title" "for a given period of time," consisting of a "listing, summary, copy or some combination thereof of documents or matters," and these "documents or matters" are deemed to impart "constructive notice under" Tennessee law, it may charge separately for this compilation as it constitutes an "abstract of title." *See id.*

Chicago Title's 2011 rate schedule set forth a $200 base charge for a residential "title search," subject to "additional charges for searches involving complex or time-consuming matters . . . [or for] copies of lengthy restrictions or easements." The $300 title-search fee

charged to S&M Homes was comprised of a $200 base charge, plus an additional $100 charge based on the volume of documents included in the search—over 200 pages of documents including tax information, deeds, deeds of trust, mortgage history, bankruptcy filings, trustee registrations, foreclosure-sale information, easement contracts, easement-subordination agreements, neighborhood covenants, land-plat profiles, and civil warrants. Many of these documents are, as a matter of Tennessee law, capable of imparting "constructive notice." Tenn. Code Ann. § 66-24-101 (stating that, among other documents, deeds, deeds of trust, mortgages, and bankruptcy petitions impart constructive notice in Tennessee). Therefore, under the applicable regulation, the instant "title search" constitutes an "abstract of title," Tenn. Comp. R. & Regs. 0780-01-12-.01(3), for which Chicago Title could charge separately, Tenn. Comp. R. & Regs. 0780-01-12-.02(1)(b).

## D.

On appeal, S&M Homes does not parse the wording of the regulations, but instead argues that the district court's interpretation: (1) eradicates the distinction between title searches and title abstracts in Tennessee; (2) alters Tennessee common law by eliminating tort liability for title abstractors; (3) effectively cedes power to the Commissioner by determining that the regulation converts title searches into title abstracts; (4) ignores that Chicago Title has argued, in other jurisdictions, that document compilations incident to title searches do not constitute title abstracts; and (5) "virtually nullifies a Tennessee tax statute that taxes title search fees on Shelby County real estate but does not tax fees for title abstracts."[2] We do not find these arguments persuasive, and address them in turn.

---

[2] In passing, S&M Homes engages with the definition of "abstract of title" and suggests that the abstract of title itself must impart constructive notice under the law. Because Chicago Title's compilation of documents did not itself impart constructive notice, argues S&M Homes, it is not an abstract of title. As indicated above, the better

**1.**

S&M Homes first argues that "the district court effectively wiped out the distinction in Tennessee law between title searches and title abstracts when it held that the Defendant's search of its own data base going back only five years constituted a title abstract." We first observe that S&M Homes's characterization of the search is incorrect. Although the chain of title only went back five years, the search included documents going back well more than five years; it includes, for example, an easement from 1980, as well as many documents from the early 2000s. Further, Chicago Title looked well beyond its own database, as many of the records come from the Shelby County Register's office. Second, S&M Homes has not established that the distinction it cites even exists. But assuming it does, the regulation clearly encompasses the title-search report prepared here. This argument fails.

**2.**

S&M Homes next argues that prior to the district court's interpretation of the regulation at issue, "title abstracts, as opposed to title searches, were governed by Tennessee common law that imposed liability on the abstractor for the abstractor's negligence in searching the entire chain of title."[3] Although not expressly stated, S&M Homes implies that abstractors cannot be held liable for negligence in preparing a simple title search.

---

reading of the regulation is that the compilation must be composed of documents or matters that give constructive notice, it need not itself impart notice.

[3] Although merely illustrative, this issue was squarely addressed by the Nebraska Supreme Court:

> We now hold that a title insurance company which renders a title report and also issues a policy of title insurance has assumed two distinct duties. In rendering the title report the title insurance company serves as an abstractor of title and must list all matters of public record adversely affecting title to the real estate which is the subject of the title report. When a title insurance company fails to perform its duty to abstract title accurately, the title insurance company may be liable in tort for all damages proximately caused by such breach of duty. A title insurance company's responsibility for its tortious conduct is distinct from the insurance company's responsibility existing on account of its policy of insurance. Different duties and responsibilities imposed on the title insurance

S&M Homes cites two cases in support of this proposition, both over one-hundred years old, *Equitable Building & Loan Ass'n v. Bank of Commerce & Trust Co.*, 102 S.W. 901 (Tenn. 1907) and *Dickel v. Nashville Abstract Co.*, 89 Tenn. 431 (Tenn. 1890). These cases do, indeed, support the proposition that a company that prepares an abstract of title omitting defects that would be disclosed by a properly prepared abstract is liable for damages suffered as a result. These cases do not, however, address the distinction between title abstracts and title searches implied in S&M Homes's argument, nor do these cases suggest that a company issuing the type of report issued here would not be subject to liability. Moreover, it appears that Tennessee courts allow negligence claims against title-search providers, subject to limitations agreed upon by the parties. *See Singer v. Highway 46 Props., LLC*, 2014 WL 4725247, at *4 (Tenn. Ct. App. Sept. 23, 2014) (slip op.) (rejecting a negligence suit against a title-search company that performed a pre-closing title search because any duty the title insurer owed was to a third party, not plaintiff); *Island Props. Assocs. v. Reaves Firm, Inc.*, 413 S.W.3d 392, 396–97 (Tenn. Ct. App. 2013); *Vestal v. Lawler*, 66 S.W.3d 866, 871 (Tenn. Ct. App. 2001). Thus, S&M Homes's underlying premise is unsupported.

Further, to the extent there was a distinction at common law between abstracts of title and title searches, it is clear that a validly enacted statute or regulation may alter the common law. *See, e.g.*, *Hodge v. Craig*, 382 S.W.3d 325, 338 (Tenn. 2012) ("[W]hen the General Assembly has acted to occupy an area of the law formerly governed by the common law, the statute must

---

company, therefore, can be the basis for separate causes of action-one cause of action in tort and another in contract.

*Heyd v. Chicago Title Ins. Co.*, 354 N.W.2d 154, 158–59 (Neb. 1984). We note this only to show that jurisdictions have been moving away from the traditional view that abstractors are liable only for breach of contract. *See also* 1 Am. Jur. 2d Abstracts of Title §§ 15–31.

prevail over the common law in the case of conflict." (citing *Knoxville Outfitting Co. v. Knoxville Fireproof Storage Co.*, 22 S.W.2d 354, 355 (Tenn. 1929))).

**3.**

S&M Homes next argues that the district court's interpretation effectively ceded power to the Commissioner by interpreting the regulation in such a way as to convert title searches into title abstracts in violation of Tennessee law. S&M Homes argues that the Tennessee statutes governing the Administration of State Departments, Tenn. Code Ann. §§ 4-4-101 *et seq.*, and the Tennessee Administrative Procedures Act ("APA"), Tenn. Code Ann. §§ 4-5-101 *et seq.*, restrict an agency's authority to alter or create law in Tennessee. Specifically, S&M Homes points to § 103 of both Chapters to argue that the district court's interpretation renders the regulation at issue invalid, presumably because it "alters" Tennessee common law.

Section 103 of the Administrative Procedures Act expressly states that it "shall be given a liberal construction and any doubt as to the existence or the extent of a power conferred shall be resolved in favor of the existence of the power." § 4-5-103(a). Subsequent sections of the APA set forth the rulemaking authority of agencies within the state. §§ 4-5-201 *et seq*. The Commissioner has the authority, under the APA, to make rules as provided by statute. As stated above, the Tennessee legislature authorized the Commissioner "to make reasonable rules and regulations as are or may be necessary for the administration of [the laws regulating title-insurance companies]." Tenn. Code Ann. § 56-35-122.[4] And, § 103 of Chapter 4 authorizes the Commissioner to promulgate regulations "not inconsistent with the law." § 4-4-103.

---

[4] S&M Homes may petition the Commissioner to amend or repeal the regulation. Tenn. Code Ann. § 4-5-201(a). It may also challenge the regulation's validity to the Department of Insurance, § 4-5-225, and appeal that decision to the Tennessee state-court system, *see, e.g.*, *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 842 (Tenn. 2008).

S&M Homes offers no reason for us to conclude that the regulations at issue were not properly promulgated, and, under the APA, Tennessee's attorney general and reporter are required to "review the legality and constitutionality of every rule filed . . . and shall approve or disapprove of rules based upon the attorney general's determination of the legality of such rules." § 4-5-211. The regulation at issue has been in effect since as early as 1984; we may assume that the Attorney General reviewed its legality and approved it as written. *See id*. Thus, the regulation at issue has the force and effect of law. *See Swift*, 159 S.W.3d at 571–72 (citation omitted); *see also Furlough*, 397 S.W.3d at 125–26. Nor does S&M Homes establish that the regulations are inconsistent with the law under the circumstances that they were authorized by the Legislature. The district court's interpretation of the regulation as written does not unlawfully cede power to the Commissioner.

**4.**

Next, citing two cases, S&M Homes argues that Chicago Title itself recognizes that the title searches it conducts incident to issuing title-insurance policies are not abstracts that would subject it to liability. The first case, *Soifer v. Chicago Title Co.*, 114 Cal. Rptr. 3d 1 (Cal. Ct. App. 2010), involved an attempt to hold Chicago Title liable based on email answers to questions regarding the seniority status of various loans pertaining to the foreclosed properties Soifer contemplated bidding on; Soifer did not seek or request a title-insurance policy or abstract of title. The California court concluded that the California Insurance Code intentionally modified the common-law rule that had held a preliminary title report to be the equivalent of an abstract of title, subjecting the title insurer to liability in negligence. The court further explained:

> We summarized the impact of the Legislature's enactment of Insurance Code, sections 12340.10 and 12340.11, "[t]he Legislature can set public policy for a state through its enactments, and here the Legislature has determined to make a formal

distinction between an 'abstract of title' and a policy of title insurance. It is only in connection with the latter document that a 'preliminary report' of title is issued. No longer will these two separate and distinct transactions be intermingled as they have been by prior case law. A preliminary report, for which little or no charge is made, is merely the inducement to purchase a title policy. It will no longer be treated or considered to have the legal consequence of an abstract of title. *If a current representation as to the status of title is required then an abstract can be ordered and separately purchased.* The effect of section 12340.10 is to make clear that a person who contracts for the written representation known as an 'abstract of title' will receive all of the rights associated with that written representation. Such a purchased and express representation can be relied upon. If negligently prepared, the abstractor obviously would be exposed to all liability which normally flows from the consequences of professional malpractice."

*Id.* at 6 (internal citations omitted; emphasis in original). Because this case specifically addresses the California Insurance Code, it has no bearing here.

In the second case, *Chicago Title Insurance Co. v. Commonwealth Forest Investors, Inc.*, 494 F. Supp. 2d 1332 (M.D. Fla. 2007), Chicago Title issued a title-insurance policy to Commonwealth, and an encumbrance not disclosed in the title search was subsequently discovered. Commonwealth sued Chicago Title for breach of contract and negligence. The case focused on the specific language of the policy and Florida's statutory requirements for insurance companies. Looking to the terms of the title-insurance policy, the court dismissed the negligence claim under Florida's interpretation of the economic-loss rule, on the basis that "Commonwealth presumably knew its potential damages when it decided to purchase the Title Policy with its specified limit on recovery of damages for title defects." *Id*. at 1337. In so doing, the court limited Commonwealth's possible recovery to the terms of the policy. There is no discussion or suggestion that the case would have been handled differently if it had involved an abstract of

title, and Chicago Title did not defend the suit by asserting that it had merely prepared a search rather than an abstract.

Neither case supports S&M Homes's argument that Chicago Title would characterize the search at issue here as a title search as opposed to an abstract of title. This argument fails.

**5.**

Finally, S&M Homes argues that by conflating title searches with abstracts of title, the district court's holding allows Chicago Title (and other title-insurance companies) to avoid paying Tennessee's "risk rate" tax. Chicago Title disagrees, arguing that services such as abstracting and record searching are expressly excluded from the amount taxed by the "risk rate" tax, and thus the district court's opinion has no effect on Tennessee's tax. Our understanding is consistent with Chicago Title's.

Tennessee's "risk rate" tax requires title-insurance companies to pay a tax of 2.5% on "all risk rate charges collected by it." Tenn. Code Ann. § 56-35-107(a). A "risk rate" charge is the "aggregate consideration paid . . . for the insurance liability assumed under the policy of title insurance . . . *exclusive* of all other charges incident to the issuance of . . . the policy for *abstracting*, *record searching*, certificates as to the record title to real estate, escrow and closing services, or other related services. . . ." Tenn. Code Ann. § 56-35-102(8) (emphases added). Thus, the tax does not distinguish between charges for an abstract of title, a title search, or other ancillary services. All such charges are excluded from the risk rate. The Tennessee title-insurance-company regulations refer to the "risk rate" amount as "a portion of the [all-inclusive rate], which shall be the risk rate for the purposes of the tax payable under the provisions of [§ 56-35-107]," thus further showing that the risk rate is only a portion of the all-inclusive rate. Tenn. Comp. R. & Reg. 0780-01-12-.02(1)(c).

In this case, Chicago Title need not pay a tax on the abstracting charge because that charge has expressly been excluded from the definition of "risk rate." Tenn. Code Ann. § 56-35-102(8) ("exclusive of all other charges . . . for abstracting, record searching. . ."). As Chicago Title's common-sense reading of the statute points out, our holding does not "nullify" the "risk rate" tax; rather, it simply recognizes that Tennessee law only taxes the actual "risk rate" revenue, not the revenue received for ancillary services.

### III.

In sum, although Chicago Title called the report for which the separate $300 fee was charged a "title search," not an "abstract of title," it nonetheless falls within the Tennessee regulation's definition of "abstract of title." We AFFIRM the district court's grant of summary judgment to Chicago Title and denial of S&M Homes's class-certification motion as moot.[5]

---

[5] We need not determine whether S&M Homes's motion for class certification should have been granted. We have previously held that "denial of class certification does not divest federal courts of jurisdiction." *Metz v. Unizan Bank*, 649 F.3d 492, 500 (6th Cir. 2011) (citing cases from the Seventh, Ninth, and Eleventh Circuits). Thus, we have jurisdiction to address the merits of S&M Homes's claim notwithstanding that jurisdiction is entirely premised on the CAFA. *See id.* ("Congress did not base CAFA jurisdiction on a civil action being 'certified' as a class action, but instead on an action being 'filed under' the rule governing class actions.").